KENNEDY BROS., Inc., et al. v. SINCLAIR et al., Rent Commission of District of Columbia.

(Court of Appeals of District of Columbia. Submitted October 23, 1922. Decided March 5, 1923.)

No. 3791.

1. **Landlord and tenant** ⊂⊃200(1½)—Minimum value, which can be reasoned from evidence, accepted in determining whether rent is confiscatory.

In determining whether the rent fixed by the rent commission is confiscatory, the court must accept the minimum market value of the plant that can be reasoned out from the evidence submitted to the commission.

2. **Landlord and tenant** ⊂⊃200(1½)—Evidence held to show rent fixed by commission would yield 6.7 per cent. on value.

Evidence as to the original cost, the reproduction cost, and the depreciation of an apartment building, and as to the operating expenses therefor, *held* to show that the rent fixed by the rent commission would yield a net return of 6.7 per cent. on the value of the building.

3. **Landlord and tenant** ⊂⊃200(1½)—Rents fixed by commission cannot be disturbed, unless confiscatory.

Even though the evidence shows that the rent was fixed by the commission at a figure which would barely escape being confiscatory, and such policy is economically unsound because it would prevent investment in buildings for rent, nevertheless the regulation of rents was committed by Congress to the commission, and the courts will not interfere with its decisions, unless they are at odds with applicable laws, or so plainly and palpably unreasonable as to make their enforcement equivalent to confiscation of property.

4. **Landlord and tenant** ⊂⊃200(1½)—Rent yielding income below 6 per cent. on investment is confiscatory.

A rent for premises which yields an income falling appreciably below 6 per cent., the legal rate of interest in the District of Columbia, is confiscatory.

---

⊂⊃For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**5. Landlord and tenant ⬦⟹200(1½)—Burden is on owner to show that rents fixed by commission are confiscatory.**

The burden is on the owners, who appeal from a decision of the rent commission to show that the rents fixed by the commission operated to reduce their income appreciably below 6 per cent., and therefore confiscated their property by denying an adequate return on their building, so that the courts cannot make any deduction for services rendered by agents, nor for probable periods of vacancy, where the owners offered no evidence on those issues.

**6. Constitutional law ⬦⟹209—Fourteenth Amendment is limited to action by states.**

The prohibition of the Fourteenth Amendment against the denial by any state of the equal protection of its laws to any person within its jurisdiction is limited to legislation by the states.

**7. Constitutional law ⬦⟹249—Landlord and tenant ⬦⟹200(1½)—Permitting tenants to seek relief from leases does not deny equal protection of the laws.**

Rent Law Oct. 22, 1919, tit. 2, § 106, does not deny equal protection of the laws to the landlord, because it permits the tenant to institute proceedings to be relieved from the obligation of the lease, and gives no similar permission to the landlord in view of the emergency justifying the legislation as an exercise of the police power.

**8. Landlord and tenant ⬦⟹200(1½)—Record held not to show rents were not properly apportioned between the apartments.**

Where the rent commission, after inspecting an apartment house, fixed the rents of each of the apartments therein, and the record does not show the commission failed to consider the size, location, and desirability of each apartment as compared with other apartments, and no application was made under Rent Law Oct. 22, 1919, tit. 2, § 108, for a rehearing and the introduction of additional evidence an assignment of error that the commission did not take those factors into consideration cannot be sustained.

**9. Landlord and tenant ⬦⟹200(1½)—Receipts from garage and business locations must be considered in determining whether rents were confiscatory.**

Regardless of whether the rent commission had authority to fix the rents for garage and business locations in an apartment house, the income received from such locations must be considered in determining whether the rentals allowed by the commission for the residence apartments were confiscatory.

Appeal from the Rent Commission.

Proceeding before A. Leftwich Sinclair and others, constituting the Rent Commission of the District of Columbia, to fix the rents in an apartment house. From a decision fixing the rents, Kennedy Bros., Inc., and another appeal. Affirmed.

B. S. Minor, H. P. Gatley, and H. B. Rowland, all of Washington, D. C., for appellants.

Chapin Brown, of Washington, D. C., for appellee.

Before SMYTH, Chief Justice, ROBB, Associate Justice, and MARTIN and SMITH, Judges of the United States Court of Customs Appeals.

SMITH, Acting Associate Justice. This is an appeal from a determination of the rent commission fixing the rent of the apartments, rooms, lockers, garage, and rooms used as offices or for business purposes in the apartment house, known as the Meridian Mansions.

---

⬦⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

The construction of the Meridian Mansions began in July, 1916, and was completed in October, 1917. On the hearing before the rent commission it appeared from the books of the owners that the value of the land upon which the apartment house was built and the expense incurred prior to construction for a preliminary loan, for a permit to grade the site, for architects', engineers', and artists' fees, and for bond, commissions, interest, and taxes, amounted to the sum of $190,-337.74. The cost of building and equipping the apartment house was as follows:

| | |
|---|---:|
| Materials and labor used for construction and equipment | $ 962,971.40 |
| Excavating | 17,158.17 |
| Builder's commissions | 73,644.60 |
| Insurance | 705.40 |
| Interest on notes to contractors | 1,093.94 |
| Additional cost for tennis court, driveway, builder's commission, furniture for furnishing apartments and for furniture for lobby | 48,147.48 |
| Interest on cash advances by owners and commissions due and unpaid | 5,855.94 |
| Total cost | $1,299,914.67 |

The American Audit Company examined the books of the owners, and after disallowing certain unpaid commissions, and interest on cash advanced and on capital invested, reported an original investment in the Meridian Mansions of $1,283,379. To this sum the audit company added $15,872.90 paid subsequent to construction for additional furniture and additional capital items, and found that the total investment on September 30, 1921, was $1,299,251.90.

That the reasonable and fair value of the original investment was $1,283,379, which on September 30, 1921, had risen to the sum of $1,299,251.90, stands in the record unimpeached and uncontradicted. Indeed, the testimony shows beyond cavil that the plant was economically established and that a cost much larger than that actually incurred could not well be regarded as either unreasonable or excessive.

The cost of reproducing the plant at the time of the hearing before the rent commission was fixed by Waddy B. Wood, architect, and a witness for the owners, at $2,560,676.64, excluding architect's commissions, title papers, and interest on the money while building. Thomas A. Mullett, architect, testified that the value of the entire plant as of the date of his testimony was $2,131,050.27, less 2 per cent. per annum for depreciation. E. R. Boyle, builder and contractor, estimated the cost of reproduction as of the time the case was heard at $2,157,624, excluding overhead and the cost of the generating plant.

Michael Weller, builder and contractor, stated on behalf of the owners that the reproduction cost, on the basis of the prevailing prices for labor and material at the time he testified, would be $2,162,401, not including the mechanical plant. Harold E. Doyle, engaged in the real estate business for 28 years, testified for the owners that in his opinion the fair and reasonable value of the Meridian Mansions, including the appurtenances, was $2,500,000, but that, due to a drop

in the cost of materials and a change in conditions, it might not readily sell for that sum. He said, however, that it would easily sell for $2,250,000, which sum he regarded as the then fair market value.

Bates Warren, a lawyer by profession, engaged in the business of buying and selling real estate, buying and selling apartment houses, and in building and operating apartment houses, testified on behalf of the owners that he did not think that reproduction cost was a fair test of value, inasmuch as reproduction costs were abnormal. Having that in mind, he allowed $2 a square foot for the land, 50 cents a cubic foot for the main building, 20 cents a cubic foot for the other items, and found a total value of $1,922,000, from which he deducted $172,000 for depreciation. He therefore concluded that the fair value of the plant was $1,750,000, which amount he said he would willingly pay for the establishment, although he admitted it was a little low. A depreciation of $172,000 is much more than that charged by the owners or reported by the American Audit Company, and is, in our opinion, a bit excessive.

The statements of receipts and expenditures submitted by the owners to the rent commission and received in evidence show the following depreciation charges for the years 1918, 1919, 1920, and 1921:

| | |
|---|---:|
| 1918 | $ 26,649.00 |
| 1919 | 27,111.18 |
| 1920 | 28,275.00 |
| 1921 | 30,000.00 |
| Total | $112,035.18 |

The report of the American Audit Company, whose business it is to audit books of account and to make allowances for depreciation in its statements concerning business enterprises and particularly utilities, was introduced in evidence by the owners and discloses that the depreciation of the building, equipment, and furniture for the years 1918, 1919, 1920, and 1921, computed from information furnished by the books of the owners, was as follows:

| | Building and Equipment. | Furniture. | Total. |
|---|---:|---:|---:|
| 1918 | $ 27,736.40 | $ 1,055.49 | $ 28,791.89 |
| 1919 | 27,738.65 | 1,060.11 | 28,798.76 |
| 1920 | 27,756.60 | 1,844.18 | 29,600.78 |
| 1921 | 27,823.65 | 6,223.14 | 34,046.79 |
| Total | $111,055.30 | $10,182.92 | $121,238.22 |

[1] As the Audit Company makes it a part of its business to calculate depreciation, and as its calculations show that on September 30, 1921, the building, equipment, and furniture had depreciated in value to the extent of $121,238.22, we think that that estimate must be accepted, rather than that made either by Warren or by the owners. Deducting $121,238.22 from $1,922,000 leaves $1,800,761.78, which we regard as the minimum market value of the plant that can be reasoned out from the evidence submitted to the rent commission and as the value which we must accept. Knoxville v. Water Co., 212 U. S. 1, 9, 29 Sup. Ct. 148, 53 L. Ed. 371.

The rent commission fixed the rent of the apartments, servants' rooms, lockers, and offices in the building at $244,590, and the rent of the garage at $18,000; total, $262,590. In the total of $262,590 is included $10 per month for 13 servants' rooms, which rental value must be regarded as part of their compensation, inasmuch as the rooms were occupied rent free.

Adding to the total rents the moneys received by the owners during the year ending September 30, 1921,

For electric current, telephone, ice, etc............................$  9,638.19
And for the ball room......... ................................  9,075.00

          Gives a gross income of.............................................$281,303.19

Subtracting from the gross income:

| | | |
|---|---:|---:|
| Operating expenses for the year ending September 30, 1921 ........................................ | $126,371.54 | |
| Depreciation on building and equipment for the year 1921 ....................................... | 27,823.65 | |
| Depreciation on furniture and fixtures for the year 1921 ...................................... | 6,223.14 | |
| Rent of servants' rooms for which no rent was paid, and which rent should therefore be charged as compensation and operating expenses... ............... | 1,560.00 | 161,978.33 |

Leaves to the owners on the basis of rents allowed a
    net income of.................................................. $119,324.86

or a little less than 6.7 on the value derived from Warren's reconstruction cost. We make no deduction for vacancies or rents not collected, or for compensation for services of Kennedy Bros., inasmuch as no definite evidence whatever was introduced concerning those items.

[2] The contention of counsel for appellants that a depreciation of $10,000 on the furniture and of $40,000 on the building and equipment should be allowed for the year 1921 is not supported by the evidence. Indeed, that claim is not only not sustained by the evidence, but it is in flat conflict with the owner's charge, the Audit Company's calculation, and the frank admission of one of the owners that a depreciation charge of only $30,000 made by them for 1921 on the building "is evidently not exactly correct."

But, ignoring for the moment the Audit Company's report as to depreciation, let us see what would result if either the owner's charge of $30,000, or 2 per cent. of Warren's reconstruction cost, or the wholly unsupported claim of $40,000 were accepted as the depreciation charge for 1921.

Substituting $30,000 for the 1921 depreciation found by the Audit Company would reduce the value of the plant to $1,798,585.43, taking Warren's reconstruction cost as the basis, and would raise the charge against gross income to $164,154.68. Subtracting $164,154.68 from $281,303.19, the gross income, would leave a net income of $117,148.51, which is more than 6 per cent. on the lessened value of $1,798,585.43.

Substituting 2 per cent. of $1,922,000, or $38,440, for the 1921 depreciation reported by the Audit Company, would reduce the value

of the plant to $1,790,145.43, taking Warren's reconstruction cost as the basis, and would raise the charge against gross income to $172,-594.68. Subtracting $172,594.68 from $281,303.19, the gross income, would leave a net income of $108,708.51, which is more than six per cent. on the diminished value.

Substituting $40,000 for the Audit Company's 1921 depreciation would reduce the value of the plant to $1,788,585.43 and would raise the charge against gross income to $174,154.68. Subtracting $174,-154.68 from $281,303.19 would leave a net income of $107,148.51, which is 5.99 per cent. per annum on a value of $1,788,585.43. Consequently, whether the owner's estimate or the Audit Company's calculation or a 2 per cent. of Warren's reconstruction cost be taken as the depreciation for 1921, the determination of the rent commission would not cut the net income below 6 per cent. per annum. A deduction of $40,000 for depreciation would reduce the annual return to only a neglible fraction under 6 per cent.

Taking into account the risks of the business, the unremitting supervision which it required of the owners, and considering that there may have been loss of rents by reason of vacancies or failure to collect, an annual income of 6⅗ per cent. on the value of the property must be regarded as very low, so low, in fact, that it leaves the unpleasant impression that it was the purpose of the commission to cut the income as close as possible to the line of confiscation without crossing it.

[3] If that was the purpose of the commission, we do not hesitate to say that, should the very great power vested in that tribunal continue to be exercised in such a way as to reduce the income from buildings to a point that barely avoids confiscation, investment in that class of property will inevitably cease to be desirable, and the second condition of tenants will become more burdensome than the first.

Price fixing and rate regulation of purely private enterprises necessarily interfere with the law of supply and demand, and, even when most carefully, prudently, and justly done, *generally* result in economic complications and social disorders worse than the evil sought to be remedied. That result must *always* follow if the arbitrament of prices or rates breeds distrust, discourages capital, or diverts it to less beneficial although safer investments. As was well said by the Supreme Court in Knoxville v. Water Co., 212 U. S. 1, 18, 29 Sup. Ct. 148, 154 (53 L. Ed. 371):

"Our social system rests largely upon the sanctity of private property, and that state or community which seeks to invade it will soon discover the error in the disaster which follows. The slight gain to the consumer, which he would obtain from a reduction in the rates charged, * * * is as nothing compared with his share in the ruin which would be brought about by denying to private property its just reward, thus unsettling values and destroying confidence."

[4] Nevertheless, as the regulation of rents for apartment houses and like properties was committed by the Congress to the rent commission, the judiciary ought not to interfere with its decisions, unless they are at odds with applicable laws, or so plainly and palpably unreasonable as to make their enforcement equivalent to confiscation of

287 F.—62

property. San Diego Land Co. v. National City, 174 U. S. 739–754, 19 Sup. Ct. 804, 43 L. Ed. 1154. In other words, the courts have the right to intervene when the commission disregards the law which called it into being or fixes a rate of income that is confiscatory, and it is confiscatory in this jurisdiction when it falls appreciably below 6 per cent., the "legal rate" of interest in the District of Columbia. Karrick v. Cantrill, 51 App. D. C. 176, 277 Fed. 578; Hirsch v. Weiner, 49 Wash. Law Rep. 626, 116 Misc. Rep. 312, 190 N. Y. Supp. 111; Lincoln Gas Co. v. Lincoln, 250 U. S. 256–267, 39 Sup. Ct. 454, 63 L. Ed. 968; Wilcox v. Consolidated Gas Co., 212 U. S. 19–49, 50, 29 Sup. Ct. 192, 53 L. Ed. 382, 15 Ann. Cas. 1034, 48 L. R. A. (N. S.) 1134; Louisville v. Cumberland Tel. & Tel. Co., 225 U. S. 430, 32 Sup. Ct. 741, 56 L. Ed. 1151.

[5] The burden was on the owners to show beyond any just or fair doubt that the decision of the rent commission in this case operated to reduce their income appreciably below 6 per cent. and consequently to confiscate their property by denying to them an adequate return on its value. Henderson Bridge Co. v. Henderson City, 173 U. S. 592–614, 615, 19 Sup. Ct. 553, 43 L. Ed. 823. The appellants did not meet that burden, although possibly proof of the value of any extraordinary services rendered by Kennedy Bros. to the enterprise, or of losses resulting from vacancies or from the failure to collect rents, might have established that the commission's determination would result in thrusting the net income out of the twilight zone of 6 per cent. into the outer darkness of confiscation.

No such proof was made or offered, however, and on the record submitted to us by this appeal we cannot say with any degree of certainty, and much less without reasonable doubt, that less than 6 per cent. on the value of the Meridian Mansions was allowed. It follows, therefore, that we cannot hold that the rent commission's determination would result in taking private property for public use without just compensation.

The appellants make the point that section 106 of title 2 of the Act of October 22, 1919 (41 Stat. 297), under which the proceedings before the rent commission were commenced, is violative of the Fourteenth Amendment to the Constitution, inasmuch as the act grants to tenants and lessees the right to sue for a modification, alteration, or change of their lease or contract of letting, and denies that right to the lessors or landlords during the term of the lease. We confess that a law is a bit discriminatory which permits one party to a contract to avoid it if he is paying too much, and denies to the other the right to cancel it because he is receiving too little. If the doors of the courts are opened by statute to one party for the purpose of impairing his solemn obligation, common ordinary justice would seem to require that they should not be barred to the other for the same purpose. But, let that be as it may be, the question is not whether injustice was done by section 106, but whether Congress had the *power* to grant to the tenant or lessee the right which was denied by that section to the landlord or lessor during the term of the lease.

[6] The Fourteenth Amendment prohibits the denial by any state

of the equal protection of its laws to any person within its jurisdiction, and, possibly, under normal conditions, section 106, if passed by a state, would be open to the objection made by counsel for appellants. See Cotting v. Kansas City, 183 U. S. 79–100, 101, 102, 22 Sup. Ct. 30, 46 L. Ed. 92. As the inhibition of the amendment is limited by its terms to legislation *by the states,* it can hardly be extended to legislation by Congress, unless we imply a limitation which was not expressed. We are not prepared to go that far, and if we were so disposed, as a matter of first impression, we certainly could not set at naught the decisions of the Supreme Court of the United States. That court in Block v. Hirsh, 256 U. S. 135, 41 Sup. Ct. 458, 65 L. Ed. 865, 16 A. L. R. 165, Brown v. Feldman, 256 U. S. 170, 41 Sup. Ct. 465, 65 L. Ed. 877, and Levy v. Siegel, 258 U. S. 242, 42 Sup. Ct. 289, 66 L. Ed. 595, unmistakably held that properties such as apartment houses were, because of a temporary emergency due to the war (Penna. Coal Co. v. Mahon, 43 Sup. Ct. 158, 67 L. Ed. ——) clothed with a public interest, and that under the police power of the states and the national government the obligation of leases and contracts for the letting of certain buildings might be impaired, notwithstanding the provisions of section 10 of article 1 of the Constitution.

[7] The guaranty to citizens of the equal protection of the laws is no more sacred than the guaranty against the impairment of the obligation of contracts, and, if one be not, neither is the other proof, against the thrust of the police powers of the government.

[8] It is assigned as error that the commission, in fixing the rents of the Meridian Mansions, did not take into consideration the size, location, and desirability of each apartment as compared with other apartments. The determination of the commission recites that it inspected the apartment house, and the record does not disclose that the factors mentioned were not taken into consideration. Moreover, no satisfactory evidence was introduced or offered which would warrant us in holding that the commission erred in fixing the rent of any particular apartment or apartments, and as no application was made under section 108 for a rehearing and the introduction of additional evidence, we cannot say what apartments, if any, were rated too high or too low. The decision in the Karrick Case that rates fixed for some apartments, and not for all, must be based on the proportion which the value of each apartment bears to the value of the entirety, is not applicable to this case, inasmuch as the rent was determined for all apartments and living rooms of the Meridian Mansions.

[9] The rents fixed for the garage, offices, and barber shop in the building apparently conform to the owners' schedule, and we therefore find it unnecessary to decide whether the action of the commission in that behalf was within its powers. Of course, the income actually derived from the garage, offices, and barber shop must be taken into account in reaching a conclusion as to whether the determination of the commission amounted to confiscation.

The decision of the rent commission is affirmed, with costs.