137 F.2d 348 (1943)
WILSON et al.
v.
BROWN, Price Adm'r.
No. 19.
United States Emergency Court of Appeals.
Heard May 10, 1943.
Decided July 15, 1943.
Rehearing Denied July 30, 1943.
*349 Clarkson W. Loucks, of Chicago, Ill., for complainants.
Nathaniel L. Nathanson, Asst. Gen. Counsel, of Washington, D.C. (Thomas I. Emerson, Associate Gen. Counsel, and Robert W. Ginnane, Benjamin Chapman, and Walter L. Reitz, Jr., Attys., all of the Office of Price Administration, all of Washington, D. C., on the brief), for respondent.
Before VINSON, Chief judge, and MARIS and MAGRUDER, Judges.
MAGRUDER, Judge.
Complainants ask this court to adjudge that Maximum Rent Regulation No. 28 is invalid insofar as it fails to provide for adjustments of maximum rents in individual cases where the generally applicable formula for determining maximum rents does not permit the landlord, though operating efficiently, to obtain a fair return upon the fair market value of the particular housing accommodations.
Maximum Rent Regulation No. 28 for Housing Accommodations Other Than Hotels and Rooming Houses in the Chicago Defense-Rental Area, and other enumerated areas, was issued on June 30, 1942, to become effective July 1, 1942. 7 F.R. 4913. For housing accommodations which were rented on March 1, 1942, the regulation prescribed that the maximum rent shall be "the rent for such accommodations on that date." The regulation provided seven grounds on which alone a landlord might file a petition for adjustment to increase the maximum rent otherwise allowable. Principally, these adjustment provisions relate to cases of substantial capital improvement or increase of services furnished, and to situations in which the rent on March 1, 1942, did not reflect the operation of normal economic forces in a free competitive market.[1]
The protest, filed under § 203(a) of the Emergency Price Control Act, 56 Stat. 31, 50 U.S.C.A. Appendix, § 923(a), recites that Wilson and Bennett are the owners of a three-story walk-up type apartment building, containing six five-room unfurnished apartments and twelve four-room unfurnished apartments. The building, which is approximately thirty years old, is located at 6150-58 South Langley Avenue and 646-648 East 62nd Street, Chicago, Illinois. "Approximately two years ago members of the Colored Race commenced to move into this neighborhood. There had previously been restrictive covenants. Until recently the tenancy in this building was Caucasian. With the infiltration of the Colored Race in the neighborhood, rentals for members of the Caucasian Race were substantially reduced in order to retain Caucasians as tenants. It was not practical or possible to mix members of these races. A building must cater to one type of tenancy or the other. The leases executed just prior to those above stated on this property were made to a Caucasian tenancy. However, due to the recent and substantial infiltration of members of the Colored Race, the Caucasian tenancy vacated, leaving Protestants with an empty building. During the period of transition, Protestants were required to accept whatever rentals they could from the dwindling Caucasian tenancy. On May 1, 1942, at the date of execution of present leases, the transition *350 had been made, and the building was occupied 100% by members of the Colored Race. Protestants were then able to bring the rentals back to normalcy. In other words, for this particular building, the present lease rentals are normal and reasonable, and comparable to rentals in similar buildings in the neighborhood where the transition was made at an earlier date. The rentals for March 1, 1942 were abnormally low as they were in effect during the transition period."
Figures are given to show that under the maximum rents established in the regulation the property will be unproductive or underproductive, in that even with efficient operation it will be impossible to earn a reasonable net return based upon the fair market value of the property. The regulation thus is alleged to result in a confiscation of complainants' property without due process of law, contrary to the Fifth Amendment, though no claim is made that the established maximum rents are not "generally fair and equitable."
Paragraph 6 of the protest recites the specific objections to the regulation, as follows:
"6. Protestants allege that the Administrator has failed to provide for or permit sufficient adjustments for certain relevant factors of general applicability in respect of such housing accommodations, as set forth herein, including increases or decreases in property and other costs, in that:
"a. The Maximum Rent Regulations for the Chicago Defense-Rental Area make no provision for a landlord, as a matter of right, to file a Petition with the local Area Rent Director for an adjustment to increase the maximum rent otherwise allowable, on the grounds that:
"(1) The rent on the date determining the maximum rent, after deducting normal expenses of operation, including general real estate taxes, depreciation, reasonable allowance for vacancies and bad accounts, etc., does not permit any net return to the landlord, thereby rendering the property wholly unproductive;
"(2) The rent on the date determining the maximum rent, after deducting normal expenses of operation, including general real estate taxes, depreciation, reasonable allowance for vacancies and bad accounts, etc., does not permit a fair and reasonable net return to the landlord, based upon the fair market value of the property as of March 1, 1942, thereby rendering the property underproductive; and that the failure of the Maximum Rent Regulations for the Chicago Defense-Rental Area to provide for or permit sufficient adjustments, in this case and in the case of other unproductive or underproductive properties, is unjust, unreasonable, confiscatory, arbitrary and oppressive."
In support of the protest, affidavits by a real estate expert and by Bennett were submitted. The figures varied somewhat, but there was evidence which if believed would justify a finding that the property under the regulation was earning a return of less than 2% on its fair market value. Taking the lowest estimate of fair market value and of expenses the return was at the rate of 3½% per year.
On January 21, 1943, the Administrator entered an order, with accompanying opinion, denying the protest. Claiming to be aggrieved thereby, Wilson and Bennett filed a timely complaint in this court under § 204(a) of the Act.
The Administrator denied the protest on the broad ground that the Act does not require provision to be made for individual adjustments of maximum rents on any such basis as claimed in the protest. The terms of the Act and its legislative history clearly support the Administrator in this conclusion.
In drafting the Emergency Price Control Act Congress had before it, as one possible method of rent control, the regulatory scheme which it had prescribed in the District of Columbia Rent Law of 1919, 41 Stat. 298, upheld in Block v. Hirsch, 1921, 256 U.S. 135, 41 S.Ct. 458, 65 L.Ed. 865, 16 A.L.R. 165. Under that Act the administrative agency had no power to issue general rent regulations, but was authorized to fix and determine a "fair and reasonable rent" in individual proceedings relating to particular rental properties. In the Emergency Price Control Act of 1942, 56 Stat. 23, 50 U.S.C.A. Appendix, § 901 et seq., Congress advisedly adopted a radically different regulatory scheme. By § 2(b) the Administrator is directed to establish such maximum rents "as in his judgment will be generally fair and equitable and will effectuate the purposes of this Act." So far as practicable he must make adjustments for relevant factors "of general applicability." Necessarily, a nation-wide regulatory program of such vast proportions as contemplated would work hardship *351 to some individuals affected. Congress was conscious of this inescapable by-product of war-time regulation. In the report of the Senate Committee on Banking and Currency (Sen.Rep. No. 931, 77th Cong., 2d Sess., 1942, p. 15), it was stated: "Because of the legislative nature of regulations establishing maximum prices, applying to large numbers of sellers, the bill does not guarantee a profit to each individual seller. It requires instead that such prices be generally fair and equitable as applied to the sellers responsible for the major part of the output of any commodity." Referring later to the rent control provisions, the report (at p. 16) stated: "Similar standards to those provided for the establishment of maximum prices are provided for the establishment of maximum rents." More significant still, when the bill was before the House, Representative Dirksen offered on the floor the following amendment: "When rents have been established as is herein provided, the same shall be adjusted upward or downward upon the application of the owner or the tenant so as to produce a gross rental which after payment of taxes and other costs of ownership, management, and operation, including depreciation and an allowance for vacancy, will provide a net return which is reasonable upon the value of the property." Mr. Dirksen urged that under this amendment "After the ceiling has been imposed, if there is an owner of a property who is not getting a fair return, he can make application and ask for review." Objection was made that this would render the bill "top-heavy with administration." The upshot was that by unanimous consent the amendment was withdrawn and in its place a substitute amendment was proposed, and adopted, which merely permitted a tenant to petition for adjustment of "an unduly high rent," whereupon the Administrator was empowered to adjust the maximum rent ceiling in such manner as to "provide a fair and reasonable rent" for the particular housing accommodation. See 87 Cong.Rec. 9211-12. Later this substitute amendment was eliminated from the bill by the Senate Committee; no further discussion of the point appears in the reports or debates in either house.
The question remains whether the Act is constitutional in authorizing the Administrator, as it undoubtedly does, to prescribe maximum rents which, while generally fair and equitable, may in individual cases prevent a landlord from earning a fair return on the basis of the fair market value of his rental property.
Complainants rely upon decisions under the District of Columbia Rent Law of 1919. Karrick v. Cantrill, 1922, 51 App.D.C. 176, 277 F. 578; Rust v. Heavey, 1923, 52 App. D.C. 320, 286 F. 782; Moore & Hill, Inc. v. Marshall, 1923, 52 App.D.C. 326, 286 F. 990; Kennedy Bros., Inc. v. Sinclair, 1923, 52 App.D.C. 398, 287 F. 972. As we have already pointed out, that Act provided for the adjustment of rents on an individual basis, the administrative agency being directed to fix a "fair and reasonable rent" for the particular property. It was natural for the courts to construe this standard as requiring a fair return on fair value of the property along the line of decisions dealing with rate regulation of public utilities. The cases under the District of Columbia Act may properly be rested on statutory construction, though the opinions sometimes talk in terms of the due process clause. Furthermore, individualized treatment which may be feasible and workable in a regulation applicable only to the District of Columbia may not necessarily be appropriate in a war-time price and rent control program on a national scale.
The due process requirement of fair return upon fair value in rate regulation of public utilities is supposed to rest upon some analogy to the requirement of just compensation in the taking of property by eminent domain. See Reagan v. Farmers' Loan & Trust Co., 1894, 154 U.S. 362, 410, 14 S.Ct. 1047, 38 L.Ed. 1014; West v. Chesapeake & Potomac Telephone Co., 1935, 295 U.S. 662, 671, 55 S.Ct. 894, 79 L.Ed. 1640. Recently the soundness of this analogy has been questioned. See concurring opinion by Black, Douglas and Murphy, JJ., in Federal Power Commission v. Natural Gas Pipe Line Co., 1942, 315 U.S. 575, 602 et seq., 62 S.Ct. 736, 86 L.Ed. 1037.
However this may be, we are satisfied that principles derived from the law of eminent domain are not the proper constitutional criterion for determining the validity of a nation-wide program of price and rent control enacted by Congress under its war powers. In the case of public utilities there is an extensive and permanent regulation of the use of the properties in the public interest, of which the regulation of rates is only a part. The situation more nearly approaches a "taking" *352 of the properties, or the use thereof, than in the case of war-time rent regulation. As the Administrator rightly points out, the Emergency Price Control Act is concerned with the regulation of prices and rents which are normally determined by the operation of economic forces in a free competitive market; it is not designed "as a permanent substitute for the normal operation of competitive forces, but as a bridge over a period of emergency when the normal influences of the market place are temporarily distorted by war conditions." The useful life of housing accommodations extends far beyond the contemplated period of rent control. There is, in fact, no appropriation of the housing accommodations at all, and so far as there is a narrow restriction on their use, it is for a very limited period. "A limit in time, to tide over a passing trouble, well may justify a law that could not be upheld as a permanent change." Block v. Hirsch, 1921, 256 U.S. 135, 157, 41 S.Ct. 458, 460, 65 L.Ed. 865, 16 A.L.R. 165. Furthermore, the Act does not require the landlord to continue his property in the market for housing accommodations. Section 4(d) of the Act provides: "Nothing in this Act shall be construed to require any person to sell any commodity or to offer any accommodations for rent." In accordance with this statutory provision, the regulation now in question provides that a landlord may evict a tenant whose lease has expired if he "seeks in good faith not to offer the housing accommodations for rent." The landlord is thus free to occupy the property himself, or devote it to some commercial enterprise, or utilize it in any other way. This serves to emphasize that there has been no "taking" of his property in the constitutional sense.
The proper test of constitutionality, we think, is the more general one applicable where legislation is challenged under the due process clause as constituting an arbitrary and capricious exercise of a granted power.
In Calhoun v. Massie, 1920, 253 U.S. 170, 175, 40 S.Ct. 474, 476, 64 L.Ed. 843, it is stated: "An appropriate exercise by a state of its police power is consistent with the Fourteenth Amendment although it results in serious depreciation of property values; and the United States may, consistently with the Fifth Amendment, impose for a permitted purpose restrictions upon property which produce like results." Complainants do not question the power of Congress to control rents as part of a war-time anti-inflation program. The validity under the due process clause of the method of rent control which Congress has authorized cannot be judged apart from a consideration of the practical necessities of administration. Jacob Ruppert v. Caffey, 1920, 251 U.S. 264, 299, 301, 40 S.Ct. 141, 64 L.Ed. 260. "The Constitution as a continuously operating charter of government does not demand the impossible or the impractical." Hirabayashi v. United States, June 21, 1943, 63 S.Ct. 1375, 1387, 87 L.Ed. ___. In Nebbia v. New York, 1934, 291 U.S. 502, 539, 54 S.Ct. 505, 517, 78 L.Ed. 940, 89 A.L.R. 1469, Mr. Justice Roberts, for the Court, said: "Price control, like any other form of regulation, is unconstitutional only if arbitrary, discriminatory, or demonstrably irrelevant to the policy the Legislature is free to adopt, and hence an unnecessary and unwarranted interference with individual liberty." Since the war-time power of Congress to control rents includes the power to adopt such means to this end as might rationally be considered necessary for the effective administration of the regulatory program, the only question remaining to the courts is whether Congress had any rational basis for its judgment that it would be administratively impracticable to operate a scheme of nation-wide rent regulation on the basis of assuring to each of many million landlords a fair return on the fair market value of his rental property.
The answer to this question is fairly obviously in the affirmative.
A good idea of the staggering administrative problem which complainants would thrust upon the Price Administrator may be gleaned from the additional adjustment provision which in their protest they suggest that the Administrator should adopt as part of the regulation. The suggestion is that any landlord should be permitted to petition for an increase of his maximum rent on the ground that:
"The rents for the entire property for a period of one year nearest the date the Petition is filed, after deducting normal and customary expenses of operation, including general real estate taxes, depreciation, reasonable allowance for vacancies and bad accounts, etc., provide a net return of less than 6% per annum to the landlord, *353 based upon the fair market value of the property as of March 1, 1942.
"In determining fair market value the Administrator shall consider sale prices of comparable properties, construction costs less depreciation and obsolescence, and rentals for comparable units in similar buildings. In determining expenses of operation the Administrator shall consider only current expenditures within the year and grant only pro rata portion to said year of those expenditures which are not annually required; interest payments shall not be regarded as an expense of operation; depreciation shall be based on normal life of building or equipment; management fees or rental commissions or both shall not exceed 5% of gross annual rentals; insurance expenditures shall be customary and reasonable; real estate taxes shall be prorated for said period. In no event, where an increase is requested on the grounds of unproductivity or underproductivity, shall the granted increase exceed a net return of 8% per annum, based upon the fair market value of the property as of March 1, 1942."
In his opinion denying the protest the Administrator forcefully states the difficulties inherent in any such proposal, as follows:
"No satisfactory standard for measuring fair value of individual rental units is readily available. The use of market value as a test is inconsistent with the regulation of rents, because the value of the property on the market depends in large measure upon its earnings and inflated rents result in inflated market values. Nor do valuations by tax authorities furnish a satisfactory standard. Such valuations frequently reflect the application of inarticulate policies and assumptions which may be valid for tax purposes but do not furnish a uniform basis for determining fair value. Furthermore, assessment practices bearing upon resulting valuations vary from locality to locality. Differences may also exist in the dates on which different properties were last appraised and the frequency with which assessed values are revised. Likewise, the original cost less depreciation formula does not provide a uniform or reliable basis for determining fair value. Original cost varies with the circumstances surrounding the construction or purchase of the rental property. Moreover, the original cost test does not take into account changes in rental value resulting from such factors as changes in the character of the neighborhood or in transportation facilities. The reproduction cost basis is also unsatisfactory because reproduction costs are highly conjectural. In addition, it fails to consider such factors as location and transportation facilities which influence rental value.
"The protestants have suggested that rentals and sale prices of comparable properties be considered in fixing a fair value for rental properties. This suggestion has only a superficial plausibility. Living accommodations are not sufficiently standardized to permit determination of comparable rents with certainty and without the necessity of extensive investigations. The factors affecting rental value are numerous, complex, and often intangible. This standard is, at best, one which results in a crude approximation of rental value and must be limited to the relatively few cases where no better standard is available because the rent on the maximum rent date was not fixed by the operation of normal economic forces or the property has been changed or the services increased since the maximum rent date.
"The determination of what rate of return on a landlord's investment is `fair' presents an additional problem. Different types of investment yield different rates of return. Furthermore, even the rate of return realized by different units representing the same type of investment varies under normal conditions. The assumption that there is one ascertainable fair return rate is entirely inconsistent with the normal situation in a competitive economy.
"All of these determinations require accurate and extensive bookkeeping records. Many landlords do not keep such records. Many others have acquired their rental properties at a recent date and do not know the facts surrounding their construction and early operation. Basing determinations on what would frequently be inadequate and incomplete records would add to the unreliability of the result. So varied and conjectural are the factors involved and so difficult is their ascertainment, that rent control based upon such foundations would necessarily be ineffective.
"The difficulties inherent in administering a rent control program based on individual determinations of fair return on *354 fair value are amply illustrated by the rent control experience after World War I. The protestants have suggested in their brief that the New York rent control experience indicates that such a procedure is feasible. The New York statute provided that the reasonableness of rents could only be challenged in private suits between landlords and tenants; there was no statutory basis for controlling exorbitant rents willingly paid by tenants. N.Y. Laws 1920, c. 136 and c. 944. The burden of administering the rent control program under the New York statute soon became onerous and court determinations were delayed many months. See e.g. Talkin v. Romer, 1920, 113 Misc. 607, 186 N.Y.S. 237. The New York courts pointed out that no definite standard for determining a reasonable rental could be formulated since the same factors could not be determinative in all cases. A. C. & H. M. Hall Realty Co. v. Moos, 1922, 115 Misc. 506, 188 N.Y.S. 858; Id., 200 App.Div. 66, 192 N.Y.S. 530; Marchbanks v. Moore, 1920, 113 Misc. 647, 185 N.Y.S. 226. Subsequent enactment of a statute requiring landlords to submit a bill of particulars relating to the rental value of their properties (N.Y. Laws 1920, c. 944) furnished only a partial solution to the difficulty. After two years of rent control, the New York legislature attempted to remedy the situation by enacting a statute providing that the fair and reasonable value should be presumed to be the assessed value. N.Y. Laws 1922, c. 664. Meanwhile, the administrative burden had become so heavy that the New York legislature found it necessary to provide that a tenant could not object to his rent as unreasonable if he had already paid three instalments of rent pursuant to the rental agreement. N.Y. Laws 1921 c. 434; N.Y. Laws 1922, c. 664.
"Apparently recognizing the difficulties present in adopting an over-all program based on individual determinations of fair return, the protestants have suggested the use of this method for establishing maximum rents only for `unproductive' and `underproductive' properties which are being efficiently operated. Such a procedure would, however, be entirely inconsistent with the rationale of the maximum rent date method. It would be inflationary insofar as it would permit landlords of `unproductive' or `underproductive' accommodations to charge higher rents than the competitive rental market would allow. To the extent that rental increases would be granted to some landlords and not to others, the adjustment provision requested by the protestants would permit landlords to utilize the demands created by war activity to secure a relative advantage which they could not have obtained in the absence of the peculiar economic circumstances created by the war.
"The protestants' suggestion that a fair return should be guaranteed only to the landlords of `efficiently operated' properties presents additional problems. Because of the large number of units and diverse methods of operations characteristic of the housing rental industry, a test of efficient operation would be difficult, if not impossible, to formulate. The protestants would apparently limit the inquiry to efficiency in methods of business operation. However, their own properties, consisting of old buildings which require extensive expenditures for upkeep and are admittedly not as well fitted to the needs of tenants as modern buildings, might well be regarded as inefficient units. Furthermore, in rental housing operations there are varying degrees of efficiency. The maximum rent date method assumes that differences ordinarily exist in the efficiency of operation of various rental units as evidenced by the varying rents which landlords themselves were charging for comparable accommodations on the maximum rent date. Therefore, preserving the rents which the landlords were charging in a normal market is a more equitable solution to the problem than would be an attempt to determine efficiency of operation on an individual basis."
We could not improve on this statement which, we think, amply demonstrates a rational basis for the judgment of Congress that to make the war-time regulation of rents effective it was necessary to authorize the Administrator to establish rents which are "generally fair and equitable" instead of requiring him to make individual adjustments so as to assure to each landlord a fair return on the fair market value of his property.
The complaint is dismissed.
Chief Judge VINSON heard the argument in this case and concurred in the conference decision of the Court thereafter, but resigned before this opinion was prepared.
NOTES
[1] Subsequently, an eighth ground for adjustment was added (8 F.R. 2673) covering situations where there has been a substantial increase in the number of occupants since the maximum rent date. The Administrator in his brief suggests that in view of certain allegations in the protest complainants may be entitled to adjustment of rents in respect of some of their dwelling units. This question is not now before us.