MARSHAL HOUSE, INC. *vs.* RENT CONTROL BOARD OF
BROOKLINE & others
(and three companion cases).[1]

Norfolk. Middlesex.    January 8, 1971. — February 10, 1971.

Present: TAURO, C.J., SPIEGEL, REARDON, QUIRICO, JJ.

*Rent Control. Brookline. Constitutional Law,* Due process of law, Equal
protection of laws, Rent control. *Equity Jurisdiction,* Declaratory
relief, Class suit. *Municipal Corporations,* Rent control. *Jurisdiction,*
Rent control. *Words,* "Fair net operating income."

The Superior Court had jurisdiction of a suit in equity under G. L. c. 231A
challenging the validity of St. 1970, c. 842, which authorizes certain
municipalities to adopt rent control, in an actual controversy present-
ing constitutional questions of urgency and importance; the exclusive
original jurisdiction of the District Courts under § 10 (a) of c. 842,
of complaints by persons aggrieved by action of a rent control board
or administrator was not pertinent. [691–692]
There was no merit in a contention that suits in equity under G. L. c. 231A
challenging the constitutionality of St. 1970, c. 842, which authorizes
certain municipalities to adopt rent control, and of St. 1970, c. 843,
which authorizes the town of Brookline to adopt rent control, brought
by certain landlords affected by municipal acceptance of the statutes
on behalf of themselves and all landlords similarly affected, were not
properly maintainable as class suits for the reasons that the named
defendants, the officials charged with administering the statutes, did
not represent tenants, for whose benefit the statutes were passed, and
that tenants were not joined as defendants. [692–693]
St. 1970, c. 842, § 3 (b) (7), providing that a municipality accepting
c. 842, which authorized certain municipalities to adopt rent control,
"may exempt those rental units for which the rent charges . . .
[exceed] limits specified by said municipality; provided that in no
event shall more than twenty-five per cent of the total rental units in
said municipality be exempted under this subsection," gives each ac-
cepting municipality the requisite flexibility to deal with its high in-
come rental units according to its particularized local needs, subject to
the twenty-five per cent limitation, and presents no constitutional
problem. [693–694]

---

[1] The companion cases are: Anna L. Aiello & another *vs.* Interim Rent
Control Administrator of Cambridge & others; Esther M. Carroll & another *vs.*
Rent Control Administrator of Cambridge & others; and William W. Goldman
& others *vs.* Rent Control Board of Brookline & others.

St. 1970, c. 842, § 3 (b) (6), providing that "the rental unit or units in an owner-occupied two-family or three-family house" shall be exempt from control under c. 842, which authorizes certain municipalities to adopt rent control, does not overstep the bounds of the police power of the Legislature, and does not make an unreasonable classification as among landlords in violation of the equal protection clause of the Fourteenth Amendment to the Constitution of the United States. [694–695]

Considering together St. 1970, c. 842, which authorizes certain municipalities to adopt rent control but exempts from control "the rental unit or units in an owner-occupied two-family or three-family house," and St. 1970, c. 843, which authorizes the town of Brookline to adopt rent control, and stresses, in its declaration of emergency respecting a housing shortage and "abnormally high rents," the "expanding student population . . . [and] a substantial elderly population," factors not assigned in the declaration of emergency in c. 842, and which does not contain the various restrictions and exemptions contained in c. 842, § 3, it was held that the Legislature and the town, through such statutes and through a by-law of the town passed pursuant to c. 843, but applying rent control only to owner-occupied two and three family houses, adopted a constitutionally sound path to solve the town's unique situation, and that the special treatment of such houses did not deny equal protection of the laws. [697–699]

St. 1970, c. 842, concerned with municipal rent control, and stating in the emergency preamble that a purpose of the act was "to alleviate the severe shortage of rental housing in certain areas of the commonwealth," and in § 1 that "a serious public emergency exists with respect to . . . housing . . . in certain areas of the commonwealth but especially in . . . [its] cities . . . regardless of population and towns with a population of fifty thousand or over," and limiting in § 2 the municipalities which may accept the act to cities and to towns with a population of fifty thousand or over, was not invalid as denying equal protection of the laws. [699–700]

St. 1970, c. 842, declaring an emergency "in certain areas of the commonwealth" with respect to the "shortage of rental housing" and "abnormally high rents" and providing that the act shall take effect only in certain municipalities which accept it, that individual or general adjustments of rent levels may be made in accepting municipalities so as to yield landlords "a fair net operating income," and containing other provisions empowering accepting municipalities to administer their own rent control fairly to both landlords and tenants, did not, by providing that the "maximum rent of a controlled rental unit shall be the rent charged the occupant for the month six months prior to the acceptance" of the act by a municipality, violate the constitutional guaranties of equal protection of the law and due process of law in that the effective rollback date would vary in accepting municipalities. [700–702]

Section 7 of St. 1970, c. 842, providing that the rent control board or administrator of a municipality which has accepted that chapter shall

make such adjustments of the maximum rents established for controlled rental units as shall "assure that rents . . . are established at rentals which yield to landlords a fair net operating income," and listing six relevant factors which should be considered, "among other[s]," in determining what constitutes such income, and § 3 of St. 1970, c. 843, providing that the rent board in the town of Brookline should adjust rents of controlled housing accommodations to assure that rents yield a "fair net operating income," and defining that term, both require that rents be set so as to assure landlords a reasonable return on their investment; there was no merit in contentions that the standards established are confiscatory, or that various landlords are denied the equal protection of the laws by reason of lack of a definition of "a fair net operating income" in c. 842, the lack of a list of relevant factors of that term in c. 843, and lack of definiteness of that term in c. 842, with the result that different accepting municipalities will have inconsistent regulations, and vagueness of the definition of that term in c. 843. [702–706]

No evidence in a suit in equity challenging the validity of a statute authorizing certain municipalities to adopt rent control and of a town by-law adopting rent control supported allegations of the plaintiff landlords that the registration information required would make "public private financial information to which . . . the public would not otherwise be entitled." [707]

Allegations of the bill in a suit in equity in the Superior Court for declaratory and injunctive relief by two tenants of a city which had accepted St. 1970, c. 842, complaining of actions of its rent control administrator and challenging the validity of an order by him fixing rents stated a case which was within the exclusive original jurisdiction of the appropriate District Court under § 10 (a) and was not suitable for treatment as a class suit, and a decree must be entered dismissing the bill. [707–709]

FOUR BILLS IN EQUITY filed in the Superior Court on October 16, 1970, October 26, 1970, October 28, 1970, and November 4, 1970, respectively.

Two cases were heard and reported by *Good, J.,* and two by *Sullivan, J.*

*James D. St. Clair (Stephen H. Oleskey* with him) for Marshal House, Inc., & others.

*Roger S. Davis* for William W. Goldman & others.

*Sarah M. Raney (John L. Mason, Jr.,* with her) for Esther M. Carroll & another.

*John M. Reed (Phillip Cowin,* Town Counsel of Brookline, & *Robert J. Muldoon, Jr.,* with him) for Rent Control Board of Brookline & others.

*Philip M. Cronin,* City Solicitor, for the Rent Control Administrator of Cambridge & others.

*John C. Cratsley* for Mary L. McCloud.

*Robert J. Condlin,* Deputy Assistant Attorney General, for the Attorney General.

*Sanford Konstadt* for James Bush.

*Kenneth A. Korb, Rudolph Kass, & Carl E. Axelrod* for Brookline Landowners Association, amicus curiae, submitted a brief.

` *Herbert P. Gleason,* Corporation Counsel, & *John M. Hyson,* Assistant Corporation Counsel, for the City of Boston, amicus curiae, submitted a brief.

*Michael E. Faden,* for Massachusetts Tenants Organizing Committee & others, amici curiae, submitted a brief.

REARDON, J.   These four cases consolidated for appeal bring to us questions arising out of two recently enacted Massachusetts rent control statutes.   The constitutionality of these statutes is under attack in three principal suits seeking declaratory and injunctive relief.   In all three the existence of an actual controversy is admitted by the principal parties.

Marshal House, Inc. (Marshal House) seeks a binding determination against the town of Brookline, its board of selectmen, and its rent control board that St. 1970, c. 842, is unconstitutional.

The plaintiffs in the suit of Anna L. Aiello and another against the city of Cambridge, its mayor, its city council, its city manager, and its interim rent control administrator also seek a binding declaration that St. 1970, c. 842, is unconstitutional.

The suit of William W. Goldman and others against the town of Brookline, its board of selectmen, and its rent control board challenges the constitutionality of St. 1970, c. 843, the special rent control enabling act applicable to Brookline, and a by-law adopted by the town thereunder.

A fourth suit, brought by Esther M. Carroll and another against the city of Cambridge, its mayor, its rent control administrator, and Henry J. O'Brien, a Cambridge land-

lord, also seeks declaratory relief and attacks certain actions of the rent control administrator for Cambridge, notably an order promulgated on October 28, 1970.

All of these suits have been reserved and reported without decision by two judges of the Superior Court upon the pleadings, exhibits and statements of agreed facts.

The constitutional issues which the three principal suits present come to us on the following facts. The Legislature enacted c. 842 on or about August 24, 1970, and the Governor approved it on August 31, 1970. After a declaration of emergency, § 2 provides that the act is to be applicable "in any city and in any town with a population of fifty thousand or over, on the thirtieth day following acceptance of its provisions."

The provisions of the act were accepted by the city of Cambridge on September 17, 1970, and by the town of Brookline on September 29, 1970. On October 16, 1970, the day before it was to take effect in Cambridge, the plaintiff Anna L. Aiello and another, Cambridge landlords affected by the act, filed their bill. On October 28, 1970, the day before the act was to take effect in Brookline, Marshal House, a Brookline property owner affected by the act, filed a similar bill.

On or about August 24, 1970, the Legislature enacted c. 843, designated as "An Act to provide for the establishment and administration of rent regulation and the control of evictions in housing accommodations in the town of Brookline." The Governor approved this act on August 31, 1970. On September 29, 1970, the town of Brookline passed a local rent control by-law, in accordance with powers granted to it under c. 843, applicable exclusively to owner-occupied two and three family dwellings in the town. This by-law, art. XXX of the Brookline by-laws, was approved by the Attorney General on October 8, 1970, and after publication it became effective on October 21, 1970. Two weeks thereafter the plaintiff William W. Goldman and six other occupying owners of two or three family houses in Brookline affected by art. XXX filed their bill asking that

c. 843 and art. XXX passed pursuant thereto be declared unconstitutional.

We omit as unnecessary a more detailed description of the proceedings which have taken place to date. The cases have aroused wide interest, as evidenced by the number of parties who were permitted to intervene and the several amicus briefs which have been submitted to us.

We will consider together the three principal cases, which present parallel issues. The numerous questions they raise can be roughly broken down into procedural objections, which do not bear on the merits of the cases; objections aimed at the various classifications, restrictions and exemptions contained in the coverage provisions of c. 842 and in many instances not present in c. 843; and objections aimed at the mechanism of rent control provided in both statutes and in art. XXX. The issues will be dealt with in that order, with headings to indicate what is the particular feature of the acts under attack. Constitutional provisions relied on by the plaintiffs are in every case the guaranty of due process of law and equal protection of the laws contained in the Fourteenth Amendment to the Constitution of the United States. The Carroll case, being susceptible to relatively summary disposition, will be dealt with separately at the end.

## THRESHOLD QUESTIONS.

*Jurisdiction.* It is contended first by the intervener James Bush in the Marshal House case that the Superior Court did not have jurisdiction under G. L. c. 231A, § 1, to entertain the two suits for declaratory relief in which c. 842 is challenged.[2] The argument is based on § 10 (a) of c. 842, granting to the District Court exclusive original jurisdiction of complaints filed by any person "aggrieved by any action, regulation or order of the board or the administrator. These

---

[2] Section 5 (b) of c. 843 explicitly gives the Superior Court jurisdiction in equity to enforce its provisions and those of any by-law adopted thereunder. The intervener's argument therefore does not apply to the Goldman case, which challenges only c. 843 and art. XXX.

are not such cases, however. The present proceedings challenge the validity of the entire statute on its face, not an isolated order under a valid enabling act.[3] See *Mansfield Beauty Academy, Inc.* v. *Board of Registration of Hairdressers*, 326 Mass. 624, 625–626. A review of § 10 (a) indicates that it cannot be made applicable to such a situation as this. The original exclusive jurisdiction of which it speaks is to lie in the District Court "within the territorial jurisdiction of which is located the controlled rental unit affected by such action, regulation or order." This provision is meaningless in the present context.

As noted above, the principal parties in the Marshal House and Aiello cases admit the existence of an actual controversy. The pleadings demonstrate a "real dispute caused by the assertion by one party of a legal . . . right in which he has a definite interest and the denial of such assertion by the other party, where the circumstances . . . indicate that, unless a determination is had, subsequent litigation as to the identical subject matter will ensue." *Hogan* v. *Hogan*, 320 Mass. 658, 662. *School Comm. of Cambridge* v. *Superintendent of Schs. of Cambridge*, 320 Mass. 516, 518. It appears to us that these cases present constitutional questions of urgency and importance eminently suited for decision by declaratory relief. *Levitt* v. *Maynard*, 104 N. H. 243, 244.

*Class action.* A second objection to the three principal cases, each of which was brought as a class action on behalf of all landlords affected by local adoption of the statutes challenged, is that they are not properly maintainable as class actions. It is not argued, however, that the plaintiffs do not adequately represent the interests of their class or that this group lacks the necessary element of "common relationship to a definite wrong" for joinder as a class. The bills allege in essence a "joint prejudice to all the class whom

---

[3] In fact, both the Marshal House and Aiello suits were brought before c. 842 took effect in Brookline and in Cambridge. This in itself is no bar to the maintenance of the suits if the requisites for declaratory relief are present. *Hoagland* v. *Bibb*, 12 Ill. App. 2d 298. *Moore* v. *Langton*, 92 R. I. 141. *Peterson* v. *Hagan*, 56 Wash. 2d 48.

the plaintiffs seek to represent." *Spear* v. *H. V. Greene Co.* 246 Mass. 259, 266. The objection raised rather is that tenants affected by cc. 842 and 843 have a right to be notified and heard in these proceedings, since both statutes were passed for their benefit, and that the named defendants do not adequately represent these interests. No authority is cited, however, for the assertion that those who challenge the constitutionality of a statute must join as defendants in addition to, or instead of, the board or agency charged with administering the statute the class for whose benefit it was passed, even assuming that such a class could be identified. This proposition seems to us unsound.[4]

### OBJECTIONS RAISED TO COVERAGE PROVISIONS.

*Optional luxury housing exemption.* Statute 1970, c. 842, § 3 (b) (7), provides that a municipality accepting the act "may exempt those rental units for which the rent charges . . . [exceed] limits specified by said municipality; provided that in no event shall more than twenty-five per cent of the total rental units in said municipality be exempted under this subsection." This optional exemption has come under two divergent attacks, both stemming from the latitude which the provision allows since it contains no specific guidelines and no requirement that there be any exemption at all in a given locality. On the one hand it is contended by the plaintiffs in the three principal cases that under the provision municipalities may exempt from coverage the very type of housing at which the act is aimed. On the other hand, the Brookline Landowners Association, in an amicus brief, claims that it is an abuse of the police power for the legislation not to require the exemption of so called "luxury units," however that term be defined, because its failure to do so makes possible local regulation of units which have

---

[4] We further believe that there is no inadequate representation of tenants' interests in these proceedings. In the Aiello case, a Cambridge tenant who alleges she faces eviction unless her rent is rolled back in accordance with the act has been permitted to intervene, and we have in the Marshal House case an amicus brief from no fewer than eight tenants' organizations, plus four other groups whose interests are not dissimilar.

no rational connection with the emergency the legislation seeks to remedy.

We see, however, no problem with the optional exemption. A mandatory exemption with the same purpose for units which rented at more than $150 a month was contained in the 1953 rent control legislation. St. 1953, c. 434, § 2 (b) (3) (iv). The 1970 situation might well have called for different treatment. In any case, the present formula gives each municipality the requisite flexibility to deal with its high income rental units according to its particularized local needs. This is subject only to the condition that the exemption not be applied so as to exclude from coverage more than twenty-five per cent of the "total rental units." That there may exist in the Commonwealth a community which cannot exempt twenty-five per cent of its units without including some low or middle income housing which the act is designed to cover provides no ground on its face for striking down the exemption. Nor does the fact that the exemption is not mandatory trouble us, for all units covered by c. 842 are subject to the comprehensive provisions for rent adjustments on an individual or class basis under §§ 8 and 10, which also provide for judicial review of all actions, regulations or orders of the local board or administrator. We view the statutory scheme as providing more than adequate protection for owners of "luxury units" in a municipality which either does not adopt the exemption or adopts it in such a way as to exclude their properties.

*Exemption for owner-occupied two and three family dwellings under c. 842.* The plaintiffs in the Marshal House and Aiello cases contend that the exemption in § 3 (b) (6) of c. 842 for "the rental unit or units in an owner-occupied two-family or three-family house" violates the equal protection clause of the Fourteenth Amendment in that it makes an unreasonable classification as among landlords. It is established that every presumption is to be indulged in favor of the validity of a legislative enactment. *School Comm. of Boston* v. *Board of Educ.* 352 Mass. 693, 699. *Druzik* v. *Board of Health of Haverhill,* 324 Mass. 129, 138–

139.  A classification contained therein may be struck down by the courts only when it is "arbitrary" and has no "fair and substantial relation to the object of the legislation." *Russell* v. *Treasurer & Recr. Gen.* 331 Mass. 501, 508. *Opinion of the Justices,* 303 Mass. 631, 645, 647.  Nor is it necessary for the Legislature to make explicit findings to support its enactments; as long as there are possible findings which the Legislature could reasonably have made in the legitimate exercise of the police power its acts will be upheld.  *Merit Oil Co.* v. *Director of the Div. on the Necessaries of Life,* 319 Mass. 301, 305.  *Massachusetts Commn. Against Discrimination* v. *Colangelo,* 344 Mass. 387, 390, 393.

Given these standards, we are unable to conclude that the Legislature overstepped the bounds of its police power when it established the exemption for owner-occupied two and three family dwellings.  Several plausible reasons for such an exemption have been suggested to us.  Landlords who live with only a few tenants and have to get along with them on a day to day basis might well have been thought to be less likely to raise rents to an exorbitant level.  Furthermore, such landlords are more likely, due to the pride of ownership, to maintain common passageways and the exteriors of their premises in a safe and clean condition.  For them the premises are not only a business property but also their home.  In any case, since they live there, they are more susceptible to tenant pressure to keep up the premises. Since the act is a product not only of unduly high rents but also of "deterioration of a substantial portion of the existing housing stock" (c. 842, § 1), this consideration might well have been another reason why the Legislature deemed it advisable to exclude owner-occupied two and three family units.  A further consideration is that many landlords within the exemption are not in the business of real estate but are merely renting out portions of their homes not necessary for their own day to day living.  The Legislature might well have concluded that the evils at which the statute is aimed are not sufficiently present among this

class of landlords to impose upon it the burdens of the statute.

Our examination of other rent control statutes, moreover, has revealed the existence of similar exemptions. The Federal Housing and Rent Act of 1947, 61 Stat. 193, was amended in 1948 to exclude from coverage "nonhousekeeping, furnished housing accommodations, located within a single dwelling unit not used as a rooming or boarding house, but only if (A) no more than two paying tenants, not members of the landlord's immediate family, live in such dwelling unit, and (B) the remaining portion of such dwelling unit is occupied by the landlord or his immediate family." 62 Stat. 93, 94. A substantially identical provision is contained in the New York State Rent Control Statute of 1950, 65 McKinney's Consol. Laws (N. Y.) (annotated), part 3, § 8582 2.(d); in regulations passed pursuant to that act (§ 9, par. 8); and in the New York City rent and rehabilitation law, Y51 – 3.0 e, 2 (e) of the Administrative Code of the City of New York, passed pursuant to the local emergency housing rent control law of 1962. This fact, plus the fact that all these laws have been upheld against numerous constitutional attacks without any serious attack having been launched on this aspect of them,[5] indicates that such an exemption raises no difficulties of constitutional proportions.

Finally, we note that although the earlier rent control

---

[5] The Federal Housing and Rent Act was sustained in *Woods* v. *Cloyd W. Miller Co.* 333 U. S. 138. (The exemption from coverage was specifically attacked in that case under the Fifth Amendment and sustained (p. 145), but the act did not at that time include the above cited provision.) The New York State Rent Control Law and local laws in New York City passed pursuant to it (N. Y. City Administrative Code U41-70 et seq.) were sustained in *Teeval Co. Inc.* v. *Stern*, 301 N. Y. 346; the New York City rent and rehabilitation law was sustained in *Hartley Holding Corp.* v. *Gabel*, 13 N. Y. 2d 306; *Eisen* v. *Eastman*, 421 F. 2d 560 (2d Cir.); and *Israel* v. *City Rent & Rehabilitation Admn. of the City of New York*, 285 F. Supp. 908 (S.D.N.Y.). See *Marcus Brown Holding Co. Inc.* v. *Feldman*, 256 U. S. 170, and *Edgar A. Levy Leasing Co. Inc.* v. *Siegel*, 258 U. S. 242, upholding earlier New York State rent control legislation against attacks based, inter alia, on the Fourteenth Amendment. Although that legislation did not contain an exemption comparable to the one here under discussion, the cases upholding it have been generally cited for the constitutionality of limited coverage provisions in rent control statutes, phrased either in terms of region or character of buildings.

legislation in this Commonwealth (St. 1953, c. 434) did not contain an exemption like the one before us, in effect it incorporated the comparable exemption of the Federal Housing and Rent Act by excluding from coverage "[a]ny housing accommodation which was not controlled under any provision of any federal rent control law . . . in effect immediately preceding the effective date of this act." § 2 (b) (5). The classification of housing accommodations provided in the 1953 act was upheld generally by this court in *Russell* v. *Treasurer & Recr. Gen.* 331 Mass. 501, 506, without discussion of this one in particular. Presumably it was not thought to be objectionable.

Nor are we troubled by the objection raised by the plaintiffs in the Goldman case with respect to the exemption in c. 842 as it operates in conjunction with art. XXX of the Brookline by-laws passed pursuant to c. 843 and covering only owner-occupied two and three family houses. Chapter 843 states that "a serious public emergency exists in the town of Brookline with respect to the housing of a substantial number of the citizens of said town." It goes on to describe the emergency as created in part by an "expanding student population . . . [and] a substantial elderly population," causes not assigned in the comparable statement of emergency in c. 842. Chapter 843 under § 2 grants the town broad general regulatory powers, unencumbered by the various restrictions and exemptions contained in § 3 of c. 842, to deal with its particular housing crisis. It is apparent from a comparison of §§ 1 and 2 of c. 843 and comparable sections of c. 842 that the problem in Brookline was unique; the question raised is whether in dealing with this situation the path which the Legislature and the town have taken is constitutionally sound.

The history of c. 843 is instructive to an understanding of it in conjunction with c. 842. It was enacted by the Legislature at the same time and approved by the Governor on the same day as c. 842. Chapter 843 was introduced on the petition of the board of selectmen by members of the Legislature from Brookline in response to our decision in *Marshal*

*House, Inc.* v. *Rent Review & Grievance Bd. of Brookline,* 357 Mass. 709, holding invalid art. XXV of the town by-laws providing for rent control without enabling legislation. The board of selectmen's recommendation appearing as an exhibit in the *Goldman* case indicates that the town felt that a continuing and urgent need for rent control existed and that enabling legislation should be passed as quickly as possible so that Brookline might continue to act as it had under art. XXV. We see no difficulty with the legislative recourse the people of the town chose to enable them to regulate rents more comprehensively than they would be able to under c. 842 alone.

We stated in the previous *Marshal House* case that the Legislature might conclude that an emergency existed in certain areas, as it clearly did here as to Brookline in passing c. 843. We said in *Russell* v. *Treasurer & Recr. Gen.* 331 Mass. 501, 507, "Having adopted a policy of rent control by . . . emergency legislation . . . [the Legislature] may also delegate to the cities and towns as governmental agencies the administration of its details in respect to matters peculiarly affecting local interests." In our view the town in enacting art. XXX of its by-laws is acting within the concededly and intentionally broad legislative authorization granted in c. 843, an act which in turn was necessary since under art. 89 of the Amendments to the Massachusetts Constitution the town itself could not continue to regulate rents without such enabling legislation.

Quite apart from the history of c. 843, which indicates it should be read according to its terms, any attempt to read into it the restrictions of c. 842 founders on our well established principle of construction that "strong terms are required to show a legislative intent to supersede by a general act a special act which 'may be made in regard to a place, growing out of its peculiar wants, condition, and circumstances.'" *Haffner* v. *Director of Pub. Safety of Lawrence,* 329 Mass. 709, 714. *Welch* v. *Contributory Retirement Appeal Bd.* 343 Mass. 502, 507. In addition, the passage of two statutes on the same subject in the same session of the

Legislature is strong evidence that they were intended to stand together. *Commonwealth* v. *Huntley*, 156 Mass. 236, 239. These two statutes taken together evidence a realization by the Legislature of the gravity of the housing situation in Brookline in particular and an intention to give the town the freedom to deal with its particular problems as it deemed best.

The special treatment provided by laws such as c. 843, passed in compliance with § 8 of art. 89, does not amount to a denial of equal protection, for any other city or town is free to follow the same procedure in seeking legislation. Should another municipality feel, as Brookline evidently did, that c. 842, for whatever reason, is not adequate for its needs in the area of rent control, the way is open for it to take the legislative avenue Brookline took. The result would be a less uniform pattern of rent control Statewide than presently exists,[6] but one which like this one would be constitutionally immune from attack, for it would be a product of differing local needs and conditions.

*Applicability of c. 842 to all cities and to towns of population over 50,000.* The plaintiffs in the Marshal House and Aiello cases contend that the limited local option provided in § 2 of c. 842 for cities regardless of population and towns with a population of 50,000 or over results in a violation of equal protection with respect to towns with a population under 50,000, which are excluded from the option. However, the limitation contained in § 2 follows from the declaration of emergency in § 1, which recites that "a serious public emergency exists with respect to . . . housing . . . in certain areas of the commonwealth *but especially in the cities of the commonwealth regardless of population and towns with a population of fifty thousand or over"* (emphasis supplied). This elaboration on the phrase "certain areas of the commonwealth" may in turn be read into the emergency preamble, which uses the same phrase without amplification. Enlargement of the meaning of the bare terms of an emergency

---

[6] In addition to c. 843, there is also a special enabling act for Boston, St. 1969, c. 797, as amended by St. 1970, c. 863.

preamble by reference to the body of an act is a procedure we have not hesitated to employ on other occasions, rather than exalt form over substance. *Russell* v. *Treasurer & Recr. Gen.* 331 Mass. 501, 504. *Molesworth* v. *Secretary of the Commonwealth,* 347 Mass. 47, 59. Thus what we have in effect is a supportable legislative finding of a housing emergency in areas of the Commonwealth as so limited. Its use as a basis for a limited coverage provision does not result in a denial of equal protection.

OBJECTIONS RAISED TO MECHANISM OF RENT CONTROL.

*The six month rollback of c. 842 and art. XXX.* It is strongly argued to us that the six month rollback feature of c. 842, § 6 (a), violates equal protection and due process of the law. This section provides that the "maximum rent of a controlled rental unit shall be the rent charged the occupant for the month six months prior to the acceptance of this act by a municipality." Presumably this objection is not voiced on the ground that maximum rents are fixed as of a given date, for this is the method of rent control to which there has been the widest resort (Willis, Rent Control: The Maximum Rent Date Method, 98 U. of Pa. L. Rev. 654), and its constitutionality has been universally upheld.[7] The contention is focussed rather on the six month period of the roll back, which it is claimed is arbitrary and bears no relationship to any ascertainable rent increase. The argument is that it will result in capricious and non-uniform administration since the effective rollback dates

---

[7] See e.g., *Bowles* v. *Willingham,* 321 U. S. 503, *Chatlos* v. *Brown,* 136 F. 2d 490 (Emer. Ct. App.), *Wilson* v. *Brown,* 137 F. 2d 348 (Emer. Ct. App.), *Hillcrest Terrace Corp.* v. *Brown,* 137 F. 2d 663 (Emer. Ct. App.), and *Spaeth* v. *Brown,* 137 F. 2d 669 (Emer. Ct. App.) (all upholding methods of rent control set forth in the Emergency Price Control Act of 1942 under which the administrator in fixing rents was to give "due consideration" to their April 1, 1941, level, with appropriate adjustments if defence activities in a given area had already led to rent increases prior to that time); *Twentieth Century Associates* v. *Waldman,* 294 N. Y. 571 (upholding commercial rent control statute of New York, which established rents after January 24, 1945, at fifteen per cent above March 1, 1943, level); *Teeval Co. Inc.* v. *Stern,* 301 N. Y. 346 (upholding rollback of rents in New York City after May 1, 1950, to March 1, 1949, levels).

will be determined by the acceptance of the act in each community rather than by its effective date.

On the other hand, it would appear that the six month rollback, if inflexible Statewide, could produce difficulties that are eliminated by the very fact that it *does* operate differently from community to community. Institution of a rollback provides a safeguard against freezing last minute rent increases into controlled rental levels and carries the advantage of setting rents "at levels which landlords and tenants had worked out for themselves by free bargaining in a competitive market" (*Hillcrest Terrace Corp.* v. *Brown*, 137 F. 2d 663, 664 (Emer. Ct. App.) at a time either before undue rent increases commenced or at least before they became so evident. The only distinction of importance between the fixing of the maximum rent date under this act and its fixing in other rent control legislation is that the effective date is not established at the beginning for each area individually to coincide with the emergency which produced the legislation nor is a procedure prescribed to ascertain such a date. We are of opinion, however, that the operation of the act as a whole is in accord with our recent suggestion that rent control legislation should take "into account circumstances in more than one community in determining the existence of an emergency." *Marshal House, Inc.* v. *Rent Review & Grievance Bd. of Brookline*, 357 Mass. 709, 719, fn. 6. "In this connection it is to be remembered that uniformity in the application of regulatory statutes is not required by the Constitution." *Taylor* v. *Brown*, 137 F. 2d 654, 659 (Emer. Ct. App.).

Initially we note that the legislation is not self-executing. The preamble declares an emergency "in certain areas of the Commonwealth," and the act is to take effect accordingly only in those communities which accept it.[8] This method seems sensible to us, the more sensible since the figures utilized as rent levels will be tailored to each com-

---

[8] We find no substance to the argument raised in one of the amicus briefs that this feature in itself amounts to a constitutional infirmity. Granting the same option to numerous communities does not amount to unequal treatment of any.

munity's determination of its need for rent control. This is preferable to a Statewide determination, as figures on the rate of increase of rents in various communities furnished to us have indicated. Finally, full provision is made in § 7 for the adjustment of rent levels on an individual or general basis from this figure so as to insure to landlords "a fair net operating income." In addition, under § 7 (e) the local authority "may remove maximum rental levels . . . for any class of controlled rental units" upon the achievement of suitable specified conditions. Under § 8 the authority may consider individual petitions for upward or downward adjustment filed by either a landlord or tenant or, on its own initiative, "may make a general adjustment, by percentage, of the rental levels for any class of controlled rental units within a municipality." The effect of all these provisions is to empower municipalities to administer their own rent control according to a mechanism which is carefully designed to insure fairness to both landlords and tenants. The six month rollback, far from impeding this task, serves as a convenient starting point. The Legislature probably could not have picked one measuring period and one mechanism to determine it which would have resulted in a closer approximation to reasonable rents with a minimum of further adjustment in the various cities and towns which accept the act.

*The term "fair net operating income" as it appears in cc. 842 and 843.* A cluster of constitutional o' ections has been raised to the standards set forth in cc. 842 and 843 for the individual or general adjustment of rents by the local administrator provided for in the two statutes.[9] Section 7 (a) of c. 842 provides that adjustments shall be made as necessary "to assure that rents for controlled rental units are established at levels which yield to landlords a fair net operating income." The latter term is not defined, but § 7 (b) lists six relevant factors which are to be considered "among other[s]" in determining what constitutes a

---

[9] Section 6 (a) of art. XXX incorporates the standard provided in c. 843.

fair net operating income: changes in property taxes; unavoidable increases or any decreases in operating and maintenance expenses; capital improvement of the unit; changes in living space, services, furniture, furnishings or equipment; substantial deterioration of the unit other than as a result of ordinary wear and tear; and failure to perform ordinary repair, replacement and maintenance. Section 3 of c. 843 likewise uses the term "fair net operating income" as the standard for adjustments, but defines it as "that income which will yield a return, after all reasonable operating expenses, on the fair market value of the property equal to the debt service rate generally available from institutional first mortgage lenders or such other rate of return as the board, on the basis of evidence presented before it, deems more appropriate to the circumstances of the case. The fair market value of the property shall be the assessed valuation of the property or such other valuation as the board, on the basis of evidence presented before it, deems more appropriate to the circumstances of the case." Chapter 843 contains no list of relevant factors such as is contained in § 7 (b) of c. 842.

It is contended first that both of these standards are confiscatory because they do not in terms provide for a reasonable return to landlords over and above all costs. We do not agree with this construction of the acts. We have previously recognized that those engaged in a lawful calling have "a right to rates which are not confiscatory, or which satisfy any higher applicable statutory standards." *Aetna Cas. & Sur. Co.* v. *Commissioner of Ins. ante,* 272, 281. We have also suggested that a rent control law should contain some such higher statutory standard, so as to insure to landlords "a fair return on the value of the property." *Answer of the Justices,* 356 Mass. 769, 773. Mindful therefore of our duty to construe statutes in a way so as to sustain their validity if possible, we read the term "fair net operating income," as used in both statutes, to require that rents be set so as to assure to landlords a reasonable return on their investment.

Nor is this a strained reading. It is in accordance with the purpose of both cc. 842 and 843, which is to alleviate those dependent on rental housing of the burden of "abnormally high rents," and not to deprive landlords of their reasonable profit. In addition, there is some similarity between this standard and the standard for insurance premiums of "adequate, just [and] reasonable," which we read in *Massachusetts Bonding & Ins. Co.* v. *Commissioner of Ins.* 329 Mass. 265, 270, to require premiums which were more than barely confiscatory.[10]

We are further faced with contradictory allegations with respect to the different elaborations of the term "fair net operating income" in cc. 842 and 843. First, it is contended that the lack of a definition of the term in c. 842 puts landlords governed by that act in a worse position than those governed by c. 843, resulting in a denial of equal protection to the former. On the other hand, it is maintained that the lack of a list of factors relevant to fair net operating income in c. 843 as in c. 842, and the very presence of a definition in c. 843, will lead to the reverse result. The fact that both arguments have been raised is indicative of the answer to both. Neither formulation of the term "fair net operating income" is inflexible enough to require a result more or less advantageous to landlords than the other. The lack of a list of relevant factors in c. 843 in no way precludes the administrator under that act from considering them; nor is he by the terms of § 3 of c. 843 irrevocably wedded in every case to the definition of "fair net operating income" therein contained. Likewise, local administrators under c. 842 are free to define "fair net operating income" by regulation as defined in c. 843.[11] Both formulations are

---

[10] Reading the standard as we do, we need not reach the difficult issue of whether landlords, like public utilities, would have a constitutional right to a fair return on the fair value of their property if not so provided by statute. See *Bowles* v. *Willingham*, 321 U. S. 503, 516–519; *Kennedy Bros. Inc.* v. *Sinclair*, 287 Fed. 972, 977–978 (D. C. Cir.); *Wilson* v. *Brown*, 137 F. 2d 348, 351–352 (Emer. Ct. App.). Compare *G. & M. Employment Serv. Inc.* v. *Commonwealth, ante,* 430,438.

[11] We note that § 2 (b) of the emergency regulations passed by the Brookline rent control board under § 5 of c. 842 does precisely this.

consistent with our holding above that the term "fair net operating income" requires a reasonable return on the fair value of the landlord's investment.

With respect to the c. 842 formulation of "fair net operating income," it is argued that its lack of definiteness will permit different communities to set up inconsistent regulations under § 5 of the act, resulting in a denial of equal protection as among the landlords in such communities. While we agree with the premise, we do not agree with the conclusion the plaintiffs Marshal House and Aiello would have us draw from it. The flexibility which c. 842 allows to each community to mold the term "fair net operating income" to accord with its peculiar local needs is a desirable feature of the act. Compare *Burnham* v. *Board of Appeals of Gloucester,* 333 Mass. 114, 118. What would be a reasonable return to landlords in one community may be much higher or lower than a comparable figure in another community. In addition, conditions may change in one community and not in another. A more rigid system which did not empower the local authority to deal with the changing needs of the locality as they developed might well only aggravate the conditions it was designed to alleviate.

The terms of § 7 of c. 842 are not original with this act. They are substantially identical to those contained in § 5 (a) of St. 1953, c. 434, earlier rent control legislation passed in this Commonwealth. We upheld that act in its entirety in *Russell* v. *Treasurer & Recr. Gen.* 331 Mass. 501, although no one thought to raise the particular point now raised by the plaintiffs. Compare *Nayor* v. *Rent Bd. of Brookline,* 334 Mass. 132, 136. The language in § 5 (a) of c. 434 seems to have been taken, in turn, from substantially identical language in § 203 of the Federal housing and rent act of 1949 (63 Stat. 18), amending § 204 (b) of the Housing and Rent Act of 1947, and authorizing individual and general adjustments by the expediter and local boards. Pursuant to § 203, the expediter set up a series of regulations which translated these criteria into specific percentage returns on the annual income from the building. The validity of § 203 and the subsequent regulations were not questioned before

the various Federal Courts which had occasion to deal with them.  *Jacobs* v. *Office of Housing Expediter,* 176 F. 2d 338, 340 (7th Cir.).   *Feeley* v. *Woods,* 190 F. 2d 228, 234 (9th Cir.). This acceptance by other courts of the language now challenged buttresses our conclusion that it is not subject to constitutional attack.

A related argument is raised by the plaintiffs in the Goldman case: that the definition of "fair net operating income" in c. 843 is unconstitutionally vague.   Without going into the possible meanings of each of the terms used in the definition, we do not accept the argument for the same reasons that we rejected its counterpart leveled at c. 842. The flexibility contained in the definition is needed in order to administer rent control effectively.   As formulated, it is entirely consistent with the overriding requirement of a reasonable return on investment which we feel to be incorporated in the term "fair net operating income."

Finally, it should be noted both with respect to the various attacks on the term "fair net operating income" and on the six month rollback provision of c. 842 and art. XXX that the attacks here are levied on the face of the statute and by-law involved.   None of the plaintiffs has introduced any evidence that the operation of either will necessarily be confiscatory with respect to him individually or with respect to a general class of landlords.   Compare *Aetna Cas. & Sur. Co.* v. *Commissioner of Ins., ante,* 272, 274–276. *G. & M. Employment Serv. Inc.* v. *Commonwealth, ante,* 430, 438–443.   Thus we have been given no basis for striking down these provisions in the present context.   Any landlord in the future who feels that they are being applied to him in a way which deprives him of a fair return on his investment is free to pursue his grievance in the courts after having exhausted the procedures provided in both c. 842 and art. XXX for adjustment of rents and judicial review of orders of the board or administrator.[12]

[12] There is no constitutional infirmity in the fact that the acts may operate initially unfairly in individual cases and that the extensive procedures for adjustment follow and do not precede such an application.   *Russell* v. *Treasurer & Recr. Gen.* 331 Mass. 501, 509.   *Bowles* v. *Willingham,* 321 U. S. 503, 520–

*The registration requirements of c. 842 and art. XXX.* The bills in all three of the principal cases raised the point that the registration requirements of § 6 (b) of c. 842, and § 4 of art. XXX, respectively, would require landlords subject to them to "[make] public private financial information to which . . . the public would not otherwise be entitled." Their allegation is unsupported by any evidence that the information which may be required, both under the above sections and § 5 (d) of c. 842, and § 3 (d) of art. XXX, is in fact private, or that it will be made public.[13]   On the other hand, it is clear that some such requirement of disclosure of information is absolutely necessary for the effective administration of rent control.   We assume that it will be properly administered and not abused; if experience should prove otherwise there will be time enough to deal with that issue when it arises.

### THE CARROLL CASE.

Having dealt with the major constitutional objections raised by the plaintiffs in the three principal cases, we need pause only briefly on the Carroll case, which arose in a different frame and which presents somewhat distinct issues. Like the other cases, this was a bill for declaratory and injunctive relief brought originally as a class action.   However, unlike the others, the plaintiffs here are tenants and the bill does not allege unconstitutional features of the rent control statute but rather complains of actions of the Cam-

521. It is established that where property rights are involved, a hearing in advance of a taking is not constitutionally required in the face of a legitimate governmental need.   *Phillips* v. *Commissioner of Int. Rev.* 283 U. S. 589, 596–597.

In fact, although not required to do so in c. 842, the administrator of rent control in Cambridge has stayed the operation of the rollback with respect to those landlords who filed for individual adjustments before December 1, 1970, the effective date of the rollback.   Rent Control Official Announcement, November 24, 1970.

[13] Similar provisions in the 1949 amendments to the Federal Housing and Rent Act of 1947 (63 Stat. 18), and the Emergency Housing Rent Control Act of New York (65 McKinney's Consol. Laws [N. Y.] [annotated], part 3, § 8586) state explicitly that no information which is deemed confidential by the administrator or the landlord shall be published unless there is an overriding public interest in it.

bridge rent control administrator in administering it prior
to October 30, 1970. These actions consisted of various
statements to the press and at a Cambridge City Council
meeting to the effect that rent control would not begin in
Cambridge as of November 1, 1970, although the act by its
terms was to take effect on October 17. The bill was later
amended to challenge the validity under c. 842 of the rent
control administrator's order issued October 28, 1970, stat-
ing, inter alia, that all tenants in Cambridge for the present
were to continue to pay rents at "the current levels." This
order has been replaced by one issued November 24, 1970,
announcing the rollback of rents of all nonexempt units to
March, 1970, levels, with the exception of those for which
landlords had in the previous month applied for individual
adjustment hearings under § 8 (a) of c. 842.

We see no need to reach the substantive issues raised by
the plaintiffs, to the extent that they have not been made
moot by the subsequent order of November 24,[14] for the
case comes squarely within § 10 (a) of the act, which provides
that original exclusive jurisdiction of complaints brought
against the administrator by persons aggrieved by any of
his actions, regulations, or orders shall lie in the District
Court "within the territorial jurisdiction of which is located
the controlled rental unit affected." The plaintiffs were
originally challenging actions of the administrator and are
now challenging one of his orders. To the extent that the
suit has devolved into a simple refund claim, the District
Court is still the appropriate forum under § 10 (b). On the
question of jurisdiction, the case can in no way be equated
with the other three dealt with in this opinion, challenging
the validity of the very enabling act involved.

It follows from our holding as to the applicability of § 10

[14] It appears that the plaintiff Carroll's case is moot, since she did not pay
the increase in rent over the March level demanded by her landlord, the de-
fendant O'Brien, and in any case is not now his tenant. The plaintiff Fleming
paid the increased rent demanded in November, but the record does not indi-
cate whether he has sought or been refused a refund. Furthermore, in the
bill Fleming did not ask for a refund by way of relief but rather for an order
that the landlord not demand rent in excess of the March level, a result already
achieved by the November 24 order.

that this case is not suitable for treatment as a class action on behalf of all tenants in Cambridge similarly affected. We have no way of knowing how other landlords responded to the rent control administrator's order of October 28, or what adjustments have been made in the meantime. Tenants or landlords who feel aggrieved by the payment or nonpayment of an increased rent in November, pursuant to or in the face of the October 28 order, remain free to take suitable steps in the District Court under §§ 10 and 11.

## CONCLUSION.

Various other points raised by the plaintiffs in the four cases herein decided have been carefully considered by the court but we do not feel they are of sufficient import to warrant further discussion.

A declaration is to be made in the three principal cases that St. 1970, c. 842 and c. 843, as well as art. XXX of the by-laws of the town of Brookline, are valid on their face. These cases are remanded to the Superior Court in the counties in which they respectively arose for proceedings consistent with this opinion. A decree is to enter dismissing the bill in the Carroll case.

*So ordered.*