KARRICK et al. v. CANTRILL et al.

(Court of Appeals of District of Columbia. Submitted December 8, 1920. Rehearing Granted April 29, 1921. Resubmitted October 10, 1921. Restored to Calendar for Reargument December 2, 1921. Resubmitted December 7, 1921. Decided January 3, 1922.)

No. 3408.

1. **Landlord and tenant �koš 200 (1½)—Courts can review facts in determining whether rents fixed by commission are confiscatory.**

Though the law creating the rent commission undertakes to limit the appellate court to a review of questions of law, the courts can review such proceedings both as to law and fact, where it is suggested that the rental rates fixed are such that they will result in confiscation, since to deny a party a judicial determination of that question would conflict with the due process clause of the Fourteenth Amendment.

2. **Landlord and tenant ⊫koš 200 (1½)—Fair rental depends on market value at time of valuation.**

The value of the property to be considered in fixing a fair rental therefor is its fair market value at the time the valuation is made.

3. **Landlord and tenant ⚷200(1½)—Cost of new building may be considered as approximate market value.**

In proceedings before the rent commission to fix reasonable rental, the cost of the building may be considered as approximately establishing its market value, where the building is new, though it is improper ordinarily to base a rental on such cost.

4. **Landlord and tenant ⚷200(1½)—Incumbrances not considered in fixing fair rental.**

The incumbrances on the building are in no case to be considered in fixing the fair rental value thereof.

5. **Landlord and tenant ⚷200(1½)—Rent of apartments in building must be based on value of those particular apartments.**

In proceedings before the rent commission to fix the fair rental value of a part only of the apartments in a building, the commission should ascertain the reasonable market value of those apartments, and base the rental thereon, without regard to the income received from other apartments not involved in the proceeding.

6. **Landlord and tenant ⚷200(1½)—Rental yielding less than 6 per cent. is confiscatory.**

Considering the hazards of the business of renting apartments and the prevailing rates of interest, rent for apartments fixed by the commission, the income from which falls below 6 per cent. of the value of the property, is confiscatory.

7. **Landlord and tenant ⚷200(1½)—Operating expenses and repairs must be deducted from gross income in determining rent.**

In determining the rent to which a landlord is entitled, the operating expenses and repairs paid by him must be deducted from the gross income before determining whether the rent yields a fair return.

8. **Landlord and tenant ⚷200(1½)—New construction to replace worn-out parts may be considered as repairs.**

In fixing the reasonable rent for apartments, new construction therein to replace worn-out parts may be considered as general repairs, and deducted from the gross income, not charged against the depreciation account, nor spread over a term of years.

9. **Landlord and tenant ⚷200(1½)—Method of computing reasonable rent stated.**

In ascertaining a reasonable rent, the rent commission should first determine the fair market value of the property, considering original cost, cost of reproduction, and rental value, then determine the gross rentals demanded, and then compute the operating expenses and deduct them from the gross rental, which will give the net rental from which a percentage of income on the fair market value can be computed.

10. **Landlord and tenant ⚷200(1½)—Rent commission's finding as to cost of building held too low.**

Evidence in proceedings to fix the fair rental for apartments in a building *held* to show that the cost of the building, as determined by the rent commission, was too low.

11. **Constitutional law ⚷298(1)—Landlord and tenant ⚷200(1½)—Fixing rents, yielding less than 3½ per cent. is unfair, and deprivation of property without due process.**

Where the rental fixed by the rent commission for a portion of an apartment building, which yielded about two-thirds of the income received from the entire building, would yield a return of between 2.62 per cent. and 3.5 per cent. on two-thirds of the valuation of the property, the rents so fixed are unfair and unreasonable, and amount to deprivation of property without due process of law, contrary to the Fourteenth Amendment.

---

⚷For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**12. Landlord and tenant** ⊕⟹200(1½)—**Commission held not to have given landlord fair hearing.**

The rent commission did not give the landlord a fair and impartial hearing, where parts of the hearing were had in the absence of counsel, the commission acting in the double capacity of judges and counsel, and where in other instances counsel were not allowed to be heard in defense of the landlord's rights.

Appeal from the Rent Commission of the District of Columbia.

Appeal by James L. Karrick and another against James E. Cantrill and others to review an order of the rent commission fixing rental rates upon apartments. Order reversed, and cause remanded, with directions to grant a rehearing.

C. H. Merillat, of Washington, D. C., for appellant.
Raymond M. Hudson, of Washington, D. C., for appellees.
Chapin Brown, of Washington, D. C., for rent commission.

VAN ORSDEL, Associate Justice. By this appeal a review is sought of an order of the rent commission of the District of Columbia fixing rental rates upon 76 apartments in the Monmouth apartment house in this city.

[1] The first question to be considered is whether the rates fixed will give defendant Karrick a reasonable return on the value of the specific property affected by the order of the commission. While the law creating the rent commission undertakes to limit the appellate court to a review of questions of law, if it is suggested that the rental rates fixed are such that they will result in confiscation, it then becomes the duty of the court, for the proper determination of that issue, to review the proceedings had before the commission, both as to law and fact. On this point, defendant cannot be deprived of a judicial investigation; otherwise, he would not be accorded due process of law.

"In all such cases, if the owner claims confiscation of his property would result, the state must provide a fair opportunity for submitting that issue to a judicial tribunal for determination upon its own independent judgment as to both law and facts; otherwise, the order is void because in conflict with the due process clause, Fourteenth Amendment." Ohio Valley Co. v. Ben Avon Borough, 253 U. S., 287, 289, 40 Sup. Ct. 527, 528 (64 L. Ed. 908).

[2] It is important to determine the elements to be considered by the commission in fixing rental rates. The first thing, of course, is to ascertain the fair market value of the property at the time of fixing the rates. As the court, construing a similar statute in New York, said in Hirsch v. Weiner (Sup.) 190 N. Y. Supp. 111 (not yet [officially] reported):

"We know no other logical method for determining rental value than to take the present market value of the property, regardless of its encumbrances as one of the factors. What the owner paid for it may be some evidence of its present value, or it may not be, depending upon the time of, and the circumstances surrounding, its purchase."

The statute here involved is analogous to statutes providing for the fixing of rates for public utilities. The statutes, and the decisions in the absence of express statutes, provide that the basis for the fixing

of rates must be the fair value of the property in use at the time the valuation is made.

[3, 4] The commission, instead of inquiring into the market value of the Monmouth at the date of the investigation, took as a basis the value of the ground, plus the cost of constructing the building. Proof of the cost of the building, like proof of the purchase price, may or may not be an important factor in determining market value. This will depend upon the circumstances of each particular case. In determining the justice of the finding in the present case, we will have to adhere to the method of ascertaining value used by the commission, which, in the present case, since the building was new, may be considered as approximately a fair basis upon which to establish market value. It is, however, an improper method, and should not be employed in any future case. In no case is the question of incumbrance to be considered. On this point we adopt the reasoning of the New York court in Hirsch v. Weiner, supra.

[5] From the order and the record, it is impossible to ascertain the exact basis upon which the rates were fixed on the 76 apartments considered. From the trend of the evidence, it is apparent, however, that the rates were based upon the entire income derived from the building. This was error. While the commission, on its own motion, had power to fix rates upon the entire building, it did not do so, but fixed rates on 76 apartments based upon the total income and value of the property. This is a false basis. The rates should be based upon the value of the 76 apartments in the proportion which their value bears to the value of the entire property. A moment's reflection will demonstrate the injustice of the course pursued by the commission. If rates were to be fixed on but a few apartments in a large building on the theory followed by the commission, it might well be that the rents received on the portion of the building not affected would be sufficient to forbid any allowance whatever on the small portion under consideration. If the rates were fixed for the benefit of the tenants first applying to the commission for relief on the basis of the total income, this would prevent a reduction of the rents of other tenants in the same building subsequently applying.

Again, a common custom prevails in this District of selling apartments and executing conveyances therefor. Suppose an apartment so owned is leased, and the commission is called upon to fix a fair rental value thereon. Could the income derived from the balance of the building be considered? The proposition answers itself. The only proper basis would be to ascertain the value of the apartment from its proportionate relation to the value of the entire property, and fix the rent so as to give the owner a fair income on the value so found, regardless of the rents obtaining in other parts of the building.

This rule of valuation for the purpose of fixing rates is well established. As was said in the Minnesota Rate Cases, 230 U. S. 352, 435, 33 Sup. Ct. 729, 755, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18:

"Where the business of the carrier is both interstate and intrastate, the question whether a scheme of maximum rates fixed by the state for intras-

tate transportation affords a fair return, must be determined by considering separately the value of the property employed in the intrastate business and the compensation allowed in the business under the rates prescribed. This was also ruled in the Smyth Case, Id., p. 541. The reason, as there stated, is that the state cannot justify unreasonably low rates for domestic transportation, considered alone, upon the ground that the carrier is earning large profits on its interstate business, and, on the other hand, the carrier cannot justify unreasonably high rates on domestic business because only in that way is it able to meet losses on its interstate business."

Coming now to what would be a fair rate, the New York court found that the landlord should have a net income from the rental of 10 per cent. of the value of the leased property. A rate that will avoid the charge of confiscation must, of necessity, depend more or less upon the facts in each particular case. In Willcox v. Consolidated Gas Co., 212 U. S. 19, 49, 29 Sup. Ct. 192, 199 (53 L. Ed. 382, 48 L. R. A. [N. S.] 1134, 15 Ann. Cas. 1034), the court affirmed the holding of the New York court:

"That a rate which would permit a return of 6 per cent. would be enough to avoid the charge of confiscation, and for the reason that a return of such an amount was the return ordinarily sought and obtained on investments of that degree of safety in the city of New York."

But in Lincoln Gas Co. v. Lincoln, 250 U. S. 256, 267, 39 Sup. Ct. 454, 63 L. Ed. 968, the court refused to approve a finding that a return of 6 per cent. could not be regarded as confiscatory, since 7 per cent. was the legal rate of interest, and "8 per cent. was the lowest rate sought and generally obtained as a return upon capital invested in banking, merchandising, and other business" in the state of Nebraska.

[6, 7] Considering, therefore, the hazards of the business, the value of money at the present time, and the prevailing rates of interest in the District of Columbia, we think that, if the net income from the rental falls below 6 per cent. of the value of the leased property, it should be treated as confiscatory. This rate, however, must be clear of the ordinary expenses. The New York court, supra, on the matter of the allowance of expenses, announced the following rule, which we approve as just and equitable:

"It is obvious that expenses for taxes, insurance, janitor services, repairs, gas and electricity, should be allowed an owner in calculating what gross income should be allowed. We think it is established in this case, as well as in other cases before us, that an annual charge for depreciation on the value of the buildings at the time for which rent is sought should be allowed. The great weight of evidence is that an annual charge of 2 per cent. per year for depreciation on the value of the buildings is fair. The federal and state governments allow such depreciation in the calculation of income tax. There is also judicial authorities for some allowance for depreciation. Schwartz v. Deutsch, 187 N. Y. Supp. 521. When vacancies are proven allowance should also be made for failure to rent by reason thereof. It also appeared in the evidence that the landlords had paid or obligated themselves to pay for repairs made to a boiler on the premises. Two sections of the boiler had become defective and were replaced by the landlords at an expense of $575. There was also included in the repair account a new floor on the roof at a cost of $400, new electric wiring, $773, awnings and window shades, $45, and new plumbing, $925. Appellant claims that the items for boiler, awnings and window shades and new plumbing should be distributable

against future earnings for 'a period of years,' that the item for new floor should be considered 'a replacement chargeable against depreciation reserve,' and that the item for electric wiring should be considered an addition to investment and capitalized. We think all of these items were properly allowed by the court below as current repairs. There are of course instances where buildings are largely remodeled and rebuilt where the improvements should be charged to increase of capital, but the items here for review are not of that character. Nor is the court impressed with the argument that repairs should be spread over a period of years and charged against future income. If that were so repairs made in the past should be brought forward and charged to current income."

[8] It follows from this analysis that, where new construction is installed to replace parts of the structure which have worn out or become defective, it belongs under the general head of repairs.

[9] In ascertaining a reasonable rate in any case, the commission should first determine the fair market value of the property. In doing this, it may consider original cost, as well as cost of reproduction; also, rental value may be considered. These are all elements to be considered; none of which, or all combined, is necessarily conclusive. Second, it should determine the gross rentals demanded by the landlord. Third, it should compute the operating expenses, to be ascertained as herein outlined, and deduct the gross expense from the gross rental. This will give the net rental, from which a percentage of income can be computed on the fair market value of the property.

As suggested, it is impossible to arrive at an accurate conclusion from this record, since evidence as to the proper items of expense in the nature of repairs was ruled out, and the evidence as to costs was so indefinite that we can only approximately arrive at a just basis, resolving all doubts in favor of the commission.

The record discloses that the total annual income from the building at the time of the investigation, allowing nothing for vacant apartments, was as follows:

| | |
|---|---:|
| 76 apartments considered by the commission | $ 75,966.00 |
| 12 furnished apartments not involved in this investigation | 14,760.00 |
| 22 unfurnished apartments not involved in this investigation | 17,280.00 |
| Café | 2,400.00 |
| East Annex | 1,800.00 |
| West Annex | 1,560.00 |
| Total income | $113,760.00 |

It will be observed that the 76 apartments considered by the commission furnish approximately two-thirds of the income.

[10] Coming, now, to the cost of the building, which, in the state of this record, must be considered in fixing its fair value, there is a sharp conflict in the evidence. It is attempted by counsel for the commission to estimate the cost of construction of the building upon a statement made by the witness Wardman that he could have built it for 35 cents per cubic foot. But this is inconsistent with his testimony as a whole, since he testified that building materials had increased 125 per cent. from 1914 to the time of the hearing; that the Calverton apartment, of similar construction, which he had recently erected, would cost him 60 cents per cubic foot; that the Somerset apartment, which

he completed just before the war, cost him from 35 cents to 40 cents per cubic foot.

The witness Essex testified that in 1917 the Monmouth would cost from 45 cents to 50 cents per cubic foot. Witness Harding testified that he estimated the Monmouth cost from $452,000 to $475,000. The witness Warren fixed the cost at the date of the hearing at 60 cents per cubic foot.

From this evidence, the injustice of estimating the cost of the building at 35 cents per cubic foot is apparent. The commission did not make any finding of value upon which to base rentals, but merely named arbitrary rates. In determining whether the rates fixed are confiscatory, we must, from all the evidence, arrive at a just basis for computing the cost in order to reach a fair basis of valuation. Considering all the evidence on the subject, and that some secondhand material was used in the construction, we think 45 cents per cubic foot a conservative cost price. On this basis we have a total value as follows:

| | |
|---|---:|
| 946,312 cubic feet at 45 cents | $435,840.40 |
| Furniture, according to the witness Plager, who paid the bills | 25,000.00 |
| Value of ground, upon which there is no dispute | 91,975.00 |
| Total value | $552,815.40 |

Taking two-thirds of this as a basis upon which to compute the value of the portion of the property under consideration by the commission, we have $368,543.20.

In arriving at the annual expense of operating the apartments from the testimony of the witness Plager, the only witness who attempted to testify by items, it appears as follows:

| | |
|---|---:|
| Pay roll | $ 9,378.36 |
| Extra help | 197.00 |
| Coal | 5,582.15 |
| Gas | 1,827.47 |
| Electricity | 3,672.86 |
| Water rent | 292.36 |
| Trash and ashes | 500.00 |
| Miscellaneous expenses enumerated | 768.86 |
| Repairs | 10,034.88 |
| Repairs to elevator | 1,602.26 |
| Taxes, real and personal | 3,231.00 |
| Insurance | 462.00 |
| Depreciation on building, 2 per cent | 8,716.00 |
| Total | $46.265.20 |

[11] Taking two-thirds of this as the portion to be borne by the 76 apartments adjudicated, we have $30,843. Deducting this from the total gross income allowed by the commission on the 76 apartments— $41,496—results in a balance of net income of $10,653, which, on the proportionate value which the 76 apartments bear to the whole property, $368,543.20, yields an income of 2.62 per cent. Computing, however, upon the unsupported statement of Wardman, it would only yield 3.5 per cent. It is apparent that this result is so unfair and unreasonable that it amounts to deprivation of property without due pro-

cess of law, within the inhibition of the Fifth Amendment to the Constitution. The rates fixed are confiscatory, and therefore void.

[12] This, however, is not the only error calling for a reversal. From this record we are convinced that, as matter of law, defendant did not have a fair and impartial hearing. Parts of the hearing were had in the absence of counsel, the commission acting in the double capacity of judges and counsel. In other instances counsel were not allowed to be heard in defense of defendant's rights. Indeed, the proceedings were conducted more in the nature of an inquisition than a judicial investigation, in which the commission was called upon to judicially determine valuable property rights.

Defendant constructed the Monmouth apartment at a time when money was in great demand and very difficult to obtain, when building materials could only be procured with difficulty and at very high prices, and when the congested condition of the District, due to the government's war activities, was acute. Defendant, assuming the hazards attendant upon this enterprise, and constructing the building in a location best suited in some degree to afford housing accommodations for government clerks and officials, should not be considered in the light of a malefactor, but rather as a public benefactor. It was this congested condition, which defendant sought in some degree to relieve, that furnished the legal basis for the emergency statute creating the rent commission.

The order is reversed with costs, and the cause remanded, with directions to the commission to vacate its order and to grant a rehearing.

Reversed and remanded.

Mr. Justice HITZ of the Supreme Court of the District of Columbia, sat in the place of Mr. Chief Justice SMYTH in the hearing and determination of this appeal.