APARTMENT AND OFFICE BUILDING
ASSOCIATION OF METROPOLITAN
WASHINGTON et al., Appellants,

v.

Walter E. WASHINGTON, Mayor, et
al., Appellees.

No. 10666.

District of Columbia Court of Appeals.

Argued Nov. 16, 1976.

Decided Nov. 28, 1977.

Eric Von Salzen, Washington, D. C., with
whom Kevin P. Charles and Martin Klep-

per, Washington, D. C., were on the brief, for appellants.

Michael A. Cain, Asst. Corp. Counsel, Washington, D. C., with whom Louis P. Robbins, Principal Deputy Corp. Counsel, and John C. Salyer, Asst. Corp. Counsel, Washington, D. C., were on the brief, for appellees.

Douglas T. Roberton, Washington, D. C., with whom Ann K. Macrory, Washington, D. C., was on the brief for appellees Adams Morgan Associates, Inc. John W. Wilmer, Jr., Washington, D. C., filed an appearance.

Before KERN, YEAGLEY and HARRIS, Associate Judges.

KERN, Associate Judge:

This is the latest litigative episode in the continuing legal struggle over the imposition of rent control within the District of Columbia which commenced with the enactment by Congress in 1973 of the District of Columbia Rent Control Act, D.C.Code 1974 Supp., § 45–1621 *et seq.* The prior decisions rendered by this court in *Apartment and Office Building Association of Metropolitan Washington v. Washington*, D.C.App., 343 A.2d 323 (1975) (hereinafter *AOBA I*), and *Apartment and Office Building Association of Metropolitan Washington v. Moore*, D.C. App., 359 A.2d 140 (1976) (hereinafter *AOBA II*), detail the past litigation that has occurred. This appeal presents for our determination the validity of the District of Columbia Rental Accommodations Act (the Act), D.C.Law No. 1–33, enacted by the City Council on November 13, 1975.[1] The appeal is taken from the trial court's denial after hearing testimony and argument of appellants' Motion for Permanent Injunctive Relief which sought to have enforcement of the Act enjoined on the ground it was unconstitutional and contrary to the holding in *AOBA I*.

The Act, *inter alia*, established: a nine-member Rental Accommodations Commission whose members are appointed by the Mayor with the advice and consent of the City Counsel and whose responsibilities in essence are (1) to promulgate rules for the administration of the Act, (2) to hear and decide appeals brought by landlords and tenants with respect to maximum permissible rents fixed by the Act, and (3) to report to the Council at fixed intervals on "the trends . . . of tax, operating and maintenance costs" and to recommend "adjustment," if necessary and desirable, "in the formula [in the Act] for computing the rent ceiling." § 45–1632(a) and (b). Further, the Act established a Rental Accommodations Office, headed by a Rent Administrator, whose function is to "carry out, according to the rules and procedures established by the Commission, the rent stabilization program established under [the Act]." §§ 45–1633, –1634(a).

The Act imposes a rent ceiling computed on the formula of taking the rent charged by a landlord for a housing accommodation per month as of February 1, 1973, and adding 4% of that rent, and thereafter, adding an amount equal to 8% of the above sum, and finally permitting the landlord to charge the tenant a further addition to the rent as will generate a "rate of return of no greater than eight percent." § 45–1644(a)(3)(A).

The Act defines the term "rate of return," as used in the formula fixing the rent ceiling, to be the "net income," *viz.*, gross income less operating expenses, property taxes, management fee, depreciation expenses and amortized costs of capital improvements, divided by assessed market value. § 45–1644(a)(3)(B).

The Act provides for the Rent Administrator to audit, if requested by a tenant, the registration statement of any landlord who increases his rent to achieve the rate of return of 8% under the formula and to award the amounts collected as a result of this increase to the landlord, in whole or in part, pending the audit. § 45–1644(h)(3).

The Act declares that the rent ceiling for a rental unit may be increased or decreased to allow for an increase or decrease in related services, *e. g.*, repairs, maintenance, utili-

---

1. D.C.Code 1977 Supp., § 45–1631 *et seq.*

ties, answering and elevator services, trash removal and janitorial services; the cost of substantial rehabilitation; and, adjustment for vacant accommodations. § 45–1644(b).

The Act provides for a landlord to file a "hardship petition" if (1) he "can show a negative cash flow after consideration of debt service," even after he has raised his rent to the point of generating a rate of return of 8%, or (2) even if he is not suffering a negative cash flow, his rate of return still does not reach 8% after raising the rent in accordance with all steps contained in the formula described above. § 45–1649(a) and (b); see also § 45–1644(c).

The Act further provides for the Rent Administrator to adjust rents by means of a decision of record upon petition by either landlord or tenant after formal hearing, if requested. An "aggrieved party" has the right of appeal to the Commission, and judicial review is provided for any person "aggrieved by a decision of the Commission or by any failure on the part of the Commission to act." § 45–1652(a) and (g); § 45–1673(a).

■ In essence, appellants first contend that, absent wartime conditions, imposition by the Council of controls on rent charged by landlords is constitutionally unwarranted; in their view, the Act was not a valid exercise of police power by the Council since no such emergency existed. To the contrary, appellants view the Act as really an effort to apportion the tenant's increased living expenses with his landlord and point to *City of Miami Beach v. Fleetwood Hotel, Inc.*, 261 So.2d 801, 804 (Fla. Sup.Ct.1972), in which the Florida court struck down as invalid a legislative effort appellants deem similar to the Act at issue.[2] But the Council's Findings and Intent with respect to the Act state that "extension of a rent control program in the District of Columbia is a necessity, in view of the continuing housing crisis. Documentation presented to the City Council . . . indicated . . . a vacancy rate in the District . . . so low . . . as to constitute an emergency according to the U.S. Department of Housing and Urban Development. . . . [T]his critical housing shortage, particularly for lower income families, is continuing to accelerate . . . . [T]he projected long range housing crisis and the need to stabilize rents over an extended period of time require enactment of a rent stabilization program . . . ." Council of the District of Columbia Report, May 19, 1975, pp. 28–29. Accordingly, we are unable to say that the Act was an unwarranted, and hence invalid, exercise of police power or was an attempt to "subsidize" tenants at the expense of landlords; rather the Act is a legislative response to a shortage of housing for District residents which the legislative body has found to exist.

■ Appellants next turn to this court's decision in *AOBA I* and argue that it established the proposition that a landlord has the *constitutional* right to pass on to his tenant the increased costs of his utilities, maintenance, etc., and that since the Act here in question contains no such "pass-through rights" for landlords it violates the Constitution. We read *AOBA I*, however, to have focused on whether the Council's rent control enactment in that case, pursuant to a specific Act of Congress then extant, complied with the congressional intent expressed that the landlord *must be* enabled to pass on his increased operating costs to the tenant in any rent control program the Council might enact. In sum, this court in *AOBA I* was called upon to determine if the Council had met the express mandate of Congress; we concluded that it did not. Thus, the basis for this court's

---

2. Specifically, appellants argue (Reply Brief at 12–13):

[A] property-owner who increases rents by no more than the amount needed to cover the increased operating costs is not engaged in "rent profiteering" . . . . . [I]f he is prevented by a rent control law from obtaining such rent increases . . . *he is being forced to subsidize the residents of his building by absorbing the increased cost* [of living] . . . . [S]uch a law is . . . "not in itself a justification" for rent controls. [Emphasis added.]

decision in *AOBA I* was the construction of legislation enacted by Congress and the Council, not the interpretation of the Constitution.[3]

■ Appellants next contend (Reply Brief at 20) that even assuming *arguendo* that the justification enunciated by the Council for imposing rent control had validity and that the Constitution does not require a pass-through mechanism in the Act, the 8% rate of return for the landlord provided by the Act is so low as to be "confiscatory." They argue that this percentage is not a reasonable return given (a) the present risk of investing in rental housing, and (b) the prevailing rates of mortgage interest on buildings similar to apartment houses, *viz.,* 10% to 12%. Whether regulation by the government of a rate of return from private property is so unreasonable as to constitute a taking without just compensation, *viz.,* a confiscatory rate, is not easily determined. In making such determination the judiciary must strike a balance: it cannot substitute its own judgment of what is wise or unwise for that of the legislature, *see Bowles v. Willingham,* 321 U.S. 503, 515, 64 S.Ct. 641, 88 L.Ed. 892 (1944), but at the same time, it must exercise its responsibility to protect the individual from any legislation that is so unreasonable as to constitute a taking of his property.[4] It has been said in this jurisdiction that the provisions of rent control must be "so plainly and palpably unreasonable as to make their enforcement equivalent to confiscation of property." *Kennedy Brothers, Inc. v. Sinclair,* 52 App.D.C. 398, 403–04, 287 F. 972, 977–78 (1923) (court comments that rent control fixing a rate of income which falls *appreciably below* "legal rate" of interest would be confiscatory).

■ Certain factors persuade us that the rate-of-return proviso in the Council's rent control legislation is not so "plainly and palpably unreasonable" to the landlord as to be confiscatory. First, the Act directs the Commission, a body composed of landlord, tenant and public members, to review continuously trends of operating costs in the District and recommend to the Council at *fixed intervals* any adjustment necessary or desirable in the formula for fixing the ceiling on rent charged. This constant scrutiny of trends of operating costs by a reasonably balanced and knowledgeable body and the mandate to this body to recommend at intervals change in the rent control formula when necessary or desirable are reasons for the court not to intrude its judgment in evaluating the rate of return unless such rate becomes, unequivocally, unreasonable.[5]

Second, the Act provides for "hardship" petitions by landlords in circumstances either (a) where their rate of return reaches

3. Appellants repeatedly refer to a single sentence in the majority opinion, *viz.,* "a workable pass-through mechanism is a necessary concomitant of a rent control program," *AOBA I, supra* at 330, as constituting a holding that a pass-through mechanism is constitutionally required of any rent control legislation. When this oft-quoted language is viewed in context, we think it declares that "pass-through" was there necessary because of the statutory requirements imposed upon the Council by Congress. Moreover, given the comprehensive and carefully constructed opinion, we would expect a pronouncement of Constitutional law to be enunciated in more detail than a single sentence, particularly when the New Jersey Supreme Court has recently reached just the opposite result, *viz.,* "The constitution [does not] . . . oblige the municipality to permit landlords to uniformly pass their costs through to their tenants." *Troy Hills Village v. Township Council,* 68 N.J. 604, 632, 350 A.2d 34, 48 (N.J. Sup.Ct.1975).

4. Mr. Justice Holmes warned in *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922), that: "The protection of private property in the Fifth Amendment presupposes that it is wanted for public use, but provides that it shall not be taken for such use without compensation. . . . The general rule . . . is that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking."

5. We recognize that the Council in the exercise of its lawmaking prerogative may choose to reject the Commission's recommendations; nevertheless, the Act has provided a mechanism for ongoing review by a knowledgeable body and submission of its findings and recommendations to the Council.

8% but their cash flow is negative, or (b) where despite rent increases the landlord still has not generated an 8% return rate. This protection accorded landlords does militate against a conclusion by this court that the rate of return, on its face, is unequivocally unreasonable in today's market.[6]

Third, the formula for fixing rent to be charged does in fact take into account the increases in a landlord's costs of utilities and maintenance so as not to require him to bear this ever-increasing financial burden alone. In short, the formula for fixing a rent ceiling, as a practical matter, does provide a sort of "pass-through" of costs from the landlord to the tenant, although concededly not to the degree Congress directed in its 1973 legislation. However, as pointed out above, that Act has expired and the Council has imposed the present rent control legislation under the authority vested in it by Congress under the District of Columbia Self-Government and Governmental Reorganization Act. P.L. 93–198, 87 Stat. 774 (Dec. 24, 1973).

Fourth, the Rental Accommodations Act is temporary since it is by its own terms applicable for a two-year period and designed to meet an emergency found by the Council to exist due to the shortage of housing, particularly for low income families.

Nor are we persuaded that the Act's limitation on the rate of return for the landlord of his rental property produces such an *unreasonable* return, *viz.,* eight percent, as to require this court to intervene and declare the Act invalid. *See Block v. Hirsh,* 256 U.S. 135, 158, 41 S.Ct. 458, 65 L.Ed. 865 (1921). It is true, as appellants assert, that risk inheres in the rental of property and that investment of capital in other ventures

will provide a return in excess of 8%; however, this has not been recognized as requiring the conclusion that rent control is invalid on the ground that the rate is unreasonable. *Troy Hills Village v. Township Council,* 68 N.J. 604, 628–30, 350 A.2d 34, 47 (N.J.Sup.Ct.1975). In assessing the reasonableness of an 8% return on investment,[7] we note that the rate of return, while not equalling the interest rates owners must pay on their purchase money loans, nevertheless exceeds the rate of interest payable on savings accounts and certificates of deposit as well as judgments obtained in court.

■ Appellants' final argument is that since any adjustment in the nature of an increase in rent requires either an audit or a formal hearing by the Administrator and since there are some 45,000 rental buildings in the city, the Act has necessarily created rent-control machinery "inherently incapable of functioning." (Reply Brief at 25–6.) Thus, as appellants see it, the Act's provisions for rent increases landlords may charge are not workable and hence the ceiling on rent has in effect become confiscatory. This court in *AOBA I* pointed out the near-chaotic condition of the rent control administrative machinery under the former Act. The Council appeared to recognize these difficulties in the administration of rent control; thus, when enacting the present Act, it expressed concern with the need to improve the administration of rent control. The legislative history of the Act before us now reflects serious efforts by the District to overcome the administrative deficiencies recognized by all and pointed out by this court in *AOBA I.* Specifically, both the Council and the Mayor have provided budgetary increases for the administration

---

**6.** Of course an 8% rate of return to the landlord in a changed economy might become so unreasonable as to require a court to intervene on constitutional grounds.

**7.** Appellants argue that the formula for determining rate of return employs the assessed value of the rental property rather than its fair market value, thus creating a significant difference. *See City of Miami Beach v. Forte Towers, Inc.,* 305 So.2d 764 (Fla.Sup.Ct.1974) (as-

sessed value only 75% of fair market value so skews the rate of return as to render rent control formula invalid). In the instant case, evidence showed the assessed values of realty sold to comprise, on the average, 88% of their sales price. Considering impact of inflation on real estate values generally within the city, the assessed value seems reasonably approximate to its fair market value. *See Troy Hills Village v. Township Council, supra,* 350 A.2d at 44.

of the instant Act; this affirmative action contrasts with the absence of resources to administer the 1973 Rent Control Act, which this court in *AOBA I* struck down as incompatible with the Congressional mandate directing "pass-through" in any rent control enacted.[8] We are not prepared to say on this record that the provision by the Act for upward adjustment of rent by landlords is inherently unworkable so as to render the Act confiscatory.[9]

The dissent relies on *Karrick v. Cantrill,* 51 App.D.C. 176, 277 F. 578 (1922). We must disagree with our colleague's statement that the decision in that case "necessitates our concluding that the Rental Accommodations Act is unconstitutional." The decision in that case did not hold the rental act there in question to be unconstitutional; it held only that the rental income fixed by the Commission for one particular landlord of from 2.63% to 3.5% is so unreasonable as to amount to a taking of property without due process. The rental act under consideration there had been declared constitutional by the Supreme Court in *Block v. Hirsh, supra.* The same day the Circuit decided *Karrick v. Cantrill,* it said in a companion case: "The appeal is here to contest the constitutionality of the rent

law, but this is no longer an open question." *Karrick v. Colman,* 51 App.D.C. 183, 184, 277 F. 585, 586 (1922). No doubt it is for this reason that in the previous litigation in this court involving the District of Columbia Rent Control Act of 1973 its constitutionality was not attacked.

*Affirmed.*

HARRIS, Associate Judge, dissenting:

I respectfully dissent. In my view, the Rental Accommodations Act is confiscatory both as enacted and as effectuated, and hence it should be ruled to be unconstitutional.

The significance of rent control upon the social and economic vitality of this city is enormous.[1] The majority opinion deals with this complex problem in a cursory fashion. Were time not a critical factor in this case, I would treat the subject in considerably more detail. However, because an extension of rent control currently is under active legislative consideration, and since the majority opinion was released yesterday, it would not be feasible to prepare a more detailed dissent.[2] Nonetheless, I do offer a few observations.

**8.** It must be remembered that in *AOBA I* we were dealing with the assertion that the Council had ignored an express Congressional mandate for pass-through to the tenant of the landlord's costs. The government's contention, in response, was that such mandate was indeed met by the "hardship" provision contained in the Council's legislation. This court concluded that the administrative tangle, clearly established on the record, prevented that particular "hardship" proviso from meeting, as a practical matter, the Congressional requirement that pass-through of costs be accorded landlords.

**9.** The trial court in the instant case (Memorandum Opinion and Order, p. 19), held that "[a]bsent some empirical evidence regarding actual administration of the legislation, it is without sufficient basis to hold that the Act is unreasonable or unworkable." No such "empirical evidence" is contained in the supplemental material filed by appellants subsequent to argument.

**1.** In an editorial entitled "Guaranteeing New York's Bonds" which was published on August 19, 1975, The Wall Street Journal stated in part:

> What is killing New York on the income side is the deterioration of its tax base, a process that will not be reversed as long as rent controls are continued.

An article in the November 19, 1977, issue of The Washington Star (p. E–4) included these observations:

> The recent extension of rent control in the District . . . has killed all hopes for straightening out the mess in the rental market.
> * * * With the exception of some government units, no new rentals have been built here in the last five years.

.         .         .         .

> Rent control, by itself, halts the building of new apartments. It also accelerates conversions into condominiums. It contributes to blight, abandonment, and, finally, to the devastation of whole neighborhoods—such as we have so vividly seen in New York City.

**2.** For thorough analyses of various rent control measures, *see, e. g., Birkenfeld v. City of Berkeley,* 17 Cal.3d 129, 130 Cal.Rptr. 465, 550 P.2d 1001 (1976); *City of Miami Beach v. Fleetwood Hotel, Inc.,* 261 So.2d 801 (Fla.1972); *Westchester West No. 2 Limited Partnership v.*

It is settled that rent control is not per se unconstitutional. The Supreme Court so ruled by a vote of five to four in *Block v. Hirsh,* 256 U.S. 135, 41 S.Ct. 458, 65 L.Ed. 865 (1921) (sustaining rent control intended to prevent profiteering due to the influx of people coming to the District of Columbia in World War I). Mr. Justice Holmes' majority opinion in that case stated in part:

> The only matter that seems to us open to debate is whether the statute goes too far. For just as there comes a point at which the police power ceases and leaves only that of eminent domain, it may be conceded that regulations of the present sort pressed to a certain height might amount to a taking without due process of law. *Martin v. District of Columbia,* 205 U.S. 135, 136, 27 S.Ct. 440, 51 L.Ed. 743. [*Id.,* at 156, 41 S.Ct. at 460.]

I readily agree with the majority's recognition that it is not for the courts to determine the wisdom of rent control; that function lies with the legislature.[3] That fact, however, does not negate the protections afforded by the Constitution to all citizens—including those who are landlords. As the Supreme Court noted in *Block v. Hirsh, supra,* at 158, 41 S.Ct. at 460: "While the [rent control] act is in force there is little to decide except whether the rent

allowed is reasonable, and upon that question the courts are given the last word."[4] *See also Apartment and Office Building Association v. Washington,* D.C.App., 343 A.2d 323, 333 (1975) (*AOBA I*).

The principal basis for my disagreement with the majority may be stated rather succinctly. Unfortunately, the Supreme Court has not dealt with a non-federal rent control plan since the early 1920's.[5] However, less than a year after the Supreme Court's decision in *Block v. Hirsh, supra,* the Court of Appeals of the District of Columbia decided *Karrick v. Cantrill,* 51 App.D.C. 176, 277 F. 578 (1922). The opinion in that case remains binding in this jurisdiction. *See M.A.P. v. Ryan,* D.C.App., 285 A.2d 310 (1971). In my judgment, *Karrick v. Cantrill* necessitates our concluding that the Rental Accommodations Act is unconstitutional.

In *Karrick v. Cantrill,* the Court of Appeals delineated the proper role of an appellate court in reviewing fixed rental rates:

> [I]f it is suggested that the rental rates fixed are such that they will result in confiscation, it then becomes the duty of the court, for the proper determination of that issue, to review the proceedings had before the [rental] commission, both as to law and fact. On this point, [the land-

---

*Montgomery County,* 276 Md. 448, 348 A.2d 856 (1975); *Marshal House, Inc. v. Rent Control Board,* 358 Mass. 686, 266 N.E.2d 876 (1971); *Hutton Park Gardens v. Town Council,* 68 N.J. 543, 350 A.2d 1 (1975).

**3.** The District of Columbia Committee of the United States Senate recently held hearings on the District's rent control laws. Its distinguished Chairman, The Honorable Thomas F. Eagleton, thereafter wrote an article entitled "Why Rent Controls Don't Work" which was published in the August 1977 issue of Reader's Digest. Senator Eagleton wrote in part (p. 109):

> [T]he sad truth is that rent controls—enacted for the best of motives to protect middle- and low-income tenants—actually work against the very people they were designed to aid.
> Washington's rent-control program has driven apartment owners, large and small, out of business. For example, more than 60 renters lost their apartments when their building was converted into a more profitable home for the aged. * * *

Studies estimate that Washington will need more than 1,200 new rental units each year to keep up with demand. Since the implementation of rent controls, however, the city has experienced a net loss in available units. Worse still, the construction of private apartments has virtually ceased. * * * Even city officials who once championed rent control now concede that the program should be phased out.

**4.** The District of Columbia appellees acknowledge in their brief that "the constitutional measure for rent control legislation generally is whether it will permit landlords to earn a reasonable return on their investments."

**5.** The Court sustained a form of federal rent control enacted by Congress in World War II which authorized "stabilization or reduction of rents for any defense-area housing accommodations within a particular defense-rental area." *Bowles v. Willingham,* 321 U.S. 503, 506, 64 S.Ct. 641, 643, 88 L.Ed. 892 (1944).

lord] cannot be deprived of a judicial investigation; otherwise, he would not be accorded due process of law. [51 App. D.C. at 178, 277 F. at 580.]

The court went on to consider whether the return permitted in that case was confiscatory. In reaching that question, it noted:

But in *Lincoln Gas Co. v. Lincoln,* 250 U.S. 256, 267 [39 S.Ct. 454, 63 L.Ed. 968], . . . the court refused to approve a finding that a return of 6 per cent. could not be regarded as confiscatory, since 7 per cent. was the legal rate of interest, and "8 per cent. was the lowest rate sought and generally obtained as a return upon capital invested in banking, merchandising, and other business" in the state of Nebraska.

Considering, therefore, the hazards of the business, the value of money at the present time, and the prevailing rates of interest in the District of Columbia, we think that, if the net income from the rental falls below 6 per cent. of the value of the leased property, it should be treated as confiscatory. This rate, however, must be clear of the [landlord's] ordinary expenses. [51 App.D.C. at 180, 277 F. at 582.]

The court then determined that at best the return permitted to the landlord on the fair market value of his rental property was only 3.5 per cent. It concluded:

It is apparent that this result is so unfair and unreasonable that it amounts to deprivation of property without due process of law, within the inhibition of the Fifth Amendment to the Constitution. The rates fixed are confiscatory, and therefore void. [51 App.D.C. at 182–83, 277 F. at 584–85.]

I reiterate that *Karrick v. Cantrill* is binding upon us. In this case, the trial judge who was asked to enjoin the enforcement of the Rental Accommodations Act made a finding of fact "that the prevailing rates on first mortgages in the District of Columbia are in the range of 10% to 12%." That finding is supported by substantial evidence and is unchallenged on appeal. The trial court acknowledged that: "To be sure, the 8% rate of return may be close to the 'line of confiscation' . . . ." However, it was unwilling to conclude "that a lower rate of return provided in the statute as to automatic rent increases is clearly confiscatory." I believe the trial court erred in so ruling.

*Karrick v. Cantrill* held that a return to a landlord which was two and one-half percentage points below the prevailing interest rate (then six percent) was confiscatory and void. Here, the trial court was confronted with a legislative mandated return which at the very best is from two to four percentage points below the prevailing rates for first mortgage loans. Such loans, of course, are fully secured and hence considerably less risky than the equity interests of those who purchase or construct and maintain rental properties. Applying the principles enunciated in *Karrick v. Cantrill,* I conclude that the eight percent return ceiling is confiscatory and void.[6]

I now point out briefly certain other infirmities which are present in the Rental Accommodations Act. Initially, the term "rate of return" is basically inappropriate in such a statutory scheme. It more aptly fits the regulation of public utilities, which to greater or lesser degrees operate in monopoly situations and have allowable rates of return determined entirely differently.

**6.** The majority opinion takes "note that the rate of return, while not equalling the interest rates owners must pay on their purchase money loans, nevertheless exceeds the rate of interest payable on savings accounts and certificates of deposit as well as judgments obtained in court." I find this comparison to alternative investments of a far less risky nature to be of no practical or constitutional significance. Far more on point is the following conclusion expressed by the Urban Law Institute on p. 9 of its study entitled "New Housing Production in the District of Columbia: Toward Possible Solutions to a Public Policy Dilemma":

Since an investor can invest his money elsewhere and earn a higher return without the extraordinary risks of operating in the District, why would he invest in new rental housing in the District. The answer, of course, is that he will not. [H.R. Serial No. 94–10, 94th Cong., 1st Sess. 145 (1975).]

See *Troy Hills Village v. Township Council,* 68 N.J. 604, 350 A.2d 34, 50–51 (1975) (Conford, P.J.A.D., concurring). (These public utilities virtually always now are afforded overall rates of return in excess of nine percent.) Be that as it may, I find the Rental Accommodations Act to be confiscatory in its practical effect as well as in its specific return limitation.

When Congress enacted a form of federal rent control in World War II, it directed the Office of Price Administration to "make adjustments for such relevant factors as . . . increases or decreases in property taxes and other costs." See *Bowles v. Willingham,* 321 U.S. 503, 514, 64 S.Ct. 641, 88 L.Ed. 892 (1944). In that case, the Supreme Court noted:

It has been pointed out that any attempt to fix rents, landlord by landlord, as in the fashion of utility rates, would have been quite impossible. * * * Such considerations of feasibility and practicality are certainly germane to the constitutional issue. [*Id.,* at 517, 64 S.Ct. at 648, citations omitted.]

Landlords, like virtually every other component of the nation's economy, have been and are continuing to be subjected to relentless cost increases. I agree with the majority that there is no constitutional right for a landlord to pass all of his cost increases immediately through to his tenants. However, equally compelling is the corollary proposition that it is confiscatory to have a rent control system which is so unworkable as effectively to preclude the proper passing through of certain cost increases. *Apartment and Office Building Association v. Moore,* D.C.App., 359 A.2d 140 (1976) (*AOBA II*).

The Supreme Court of California recently affirmed the enjoining of a city's rent control enactment. *Birkenfeld v. City of Berkeley,* 17 Cal.3d 129, 130 Cal.Rptr. 465, 550 P.2d 1001 (1976) (en banc). I commend its careful treatment of the entire subject to the attention of an interested reader, and I invite particular consideration of its analysis of the unworkable mechanism by which the charter there at issue supposedly would have permitted landlords to seek rent increases. See 130 Cal.Rptr. at 492–97, 550 P.2d at 1028–33. That court concluded in part:

But under the charter amendment as it now stands the combination of the rollback to base rents and the inexcusably cumbersome rent adjustment procedure is not reasonably related to the amendment's stated purpose of preventing excessive rents and so would deprive the plaintiff landlords of due process of law if permitted to take effect. [130 Cal. Rptr. at 497, 550 P.2d at 1033.]

I would reach the same conclusion here. In the article by Senator Eagleton to which I referred in footnote 3, *supra,* he stated (at 110):

Often "hardship increases" do not approach the actual rise in owners' costs. In court actions, apartment owners have argued that they should be allowed to pass-through unavoidable increases in operating costs. But the city contends: "Unlimited pass-throughs would mean no control of rents at all."

As I analyze the record before us, the unworkability of the statutory rent increase mechanisms has been amply demonstrated. Senator Eagleton also alluded to this problem in his article, stating:

Along with contributing to urban blight, the city's rent-control procedures also create demoralizing and costly red tape—"an administrative nightmare," says the Washington *Post.* It took one apartment-building owner six months— and a good lawyer—to win a hardship rent increase despite the fact that not a single tenant opposed his application. Another modest apartment investor waited more than two years before winning an emergency increase on a building that clearly was losing money throughout the period. * * *

Beyond the unworkable procedures for seeking rent increases, the Act further is skewed against landlords. For one thing, the so-called rate of return is measured against a rental property's appraised value, rather than its normally higher fair market

value.[7] This is confiscatory in and of itself. In *Karrick v. Cantrill, supra,* the Court of Appeals flatly stated:

> It is important to determine the elements to be considered by the commission in fixing rental rates. The first thing, of course, is to ascertain the fair market value of the property at the time of fixing the rates. [51 App.D.C. at 178, 277 F. at 580.]

Additionally, in seeking rent increases, a landlord is bound by his actual operating expenses for a prior 12-month period.[8] Continuing inflation thus makes even the theoretically allowable eight percent return illusory and unachievable, absent unanticipated cost reductions.[9]

I comment finally on the "emergency" aspects of the case. Unquestionably, bona fide housing emergencies existed in World War I and World War II which led to the rent controls which were sustained by the Supreme Court in *Block v. Hirsh, supra,* and *Bowles v. Willingham, supra.* In *Block v. Hirsh,* the Court stated:

> The regulation is put and justified only as a temporary measure. A limit in time, to tide over a passing trouble, well may justify a law that could not be upheld as a permanent change. [256 U.S. at 157, 41 S.Ct. at 460; citations omitted.]

In *Birkenfeld v. City of Berkeley, supra,* the Supreme Court of California stressed:

> [T]he constitutionality of residential rent controls under the police power depends upon the actual existence of a housing shortage and its concomitant ill effects of sufficient seriousness to make

rent control a rational curative measure. [130 Cal.Rptr. at 488, 550 P.2d at 1024.]

In this case, the Council asserted the existence of an emergency which it saw as giving rise to the "need to stabilize rents over an extended period of time. . . ." The majority opinion quotes and accepts that declaration. Then, however, the majority opinion states as one basis for its finding the Act not to be confiscatory: "[T]he Rental Accommodations Act is temporary since it is by its own terms applicable for a two-year period . . . ." That two-year period now has expired, and the majority opinion was released yesterday, to be available for the Council to consider today as it decides whether to enact new rent control legislation covering the next three years. It appears that both the "emergency" and rent control are likely to be with the District of Columbia for a considerable period of time.

I now conclude, so that this regrettably truncated dissent will not become unduly separated in time from the majority opinion. I share the concerns felt by many people for the undoubted hardships which rent increases effect on many tenants. However, the protections afforded by the Constitution do not stop at the tenant's door, and any permissible solution to the problems of contemporary economic facts of life must not be confiscatory in its effect upon landlords. I am unable to share my Brothers' belief that the Rental Accommodations Act passes constitutional muster, and I therefore respectfully dissent.

---

7. Here the landlords face a dilemma, for the fair market value of rental property is to a major degree a function of its ability to earn income on the investment it requires. Uneconomic rents inevitably decrease the sale value of rental property, if indeed a willing buyer can be found for a willing seller. The vicious cycle becomes complete when controlled uneconomic rents produce losses, for then rental properties will lie fallow awaiting hopefully better times for existing or prospective investors.

8. "Operating expenses" are defined in the Act as "the expenses for the upkeep of the accommodation for any consecutive 12 month period

in the 15 months immediately preceding the filing of the [required] registration statement . . . ." D.C.Code 1977 Supp., § 45–1641(u).

9. In their brief, the government appellees treat this problem with regrettably unwarranted optimism as follows:

> But, the landlords complain, it is impossible to sustain even the 8% rate because costs will almost inevitably continue to rise. This totally self-serving allegation is too speculative a basis upon which to conclude that the return provided by the Act is unconstitutionally confiscatory as a matter of law.